WOOD v HERNDON & HERNDON INVESTIGATIONS, INC

Docket No. 114085. Submitted May 8, 1990, at Detroit. Decided July 5, 1990; approved for publication November 19, 1990, at 9:00 A.M.

Deborah and Edward Wood brought an action in the Wayne Circuit Court against Herndon & Herndon Investigations, Inc., and Walter D. Herndon, Jr., alleging tortious interference with contract, after their automobile insurer rejected their claim for the loss of their automobile following an arson investigation conducted by the defendants. The trial court, John H. Hausner, J., granted summary disposition in favor of the defendants, ruling that no genuine issue of material fact existed and the defendants were entitled to judgment as a matter of law. The plaintiffs appealed.

The Court of Appeals *held:*

A person who alleges tortious interference with a contractual or business relationship must allege the intentional doing of an act wrongful per se or the doing of a lawful act with malice and unjustified in law for the purpose of invading the contractual rights or business relationship of another.

In this case, the defendants' practice of conducting preliminary investigations of burned automobiles on their own initiative, preparing a list of the vehicle identification numbers and the titleholders of those automobiles and submitting the list to the automobile insurers at no cost, and conducting more complete investigations upon request and payment did not indicate any wrongful or malicious intent to interfere with contracts between automobile insurers and their insureds.

Affirmed.

*Mindell, Panzer, Mulcahy & Malin* (by *Brian A. Kutinsky*), for the plaintiffs.

*Garan, Lucow, Miller, Seward, Cooper & Becker, P.C.* (by *James G. Gross*), for the defendants.

Before: MacKenzie, P.J., and Sawyer and Doctoroff, JJ.

Per Curiam. Plaintiffs appeal from an order of the Wayne Circuit Court granting summary disposition in favor of defendants on plaintiffs' claims for tortious interference with contract and intentional infliction of emotional distress pursuant to MCR 2.116(C)(10) (no genuine issue of material fact). We affirm.

Plaintiffs own a station wagon which they reported stolen on September 19, 1984. The automobile had, in fact, been destroyed by fire several hours earlier a few miles from plaintiffs' home. The fire marshal's report lists the probable cause of the fire as arson.

Defendants are engaged in a private investigation business in the City of Detroit. Beginning in April of 1982, defendant Herndon and his investigation agency began a program of investigation of all motor vehicle fires, other than those ascribed to carburetor backfires and electrical short circuits, which occur within the City of Detroit. Defendants do so without any formal contract with an insurance company.

Specifically, Herndon has an arrangement with the Detroit Fire Department. In exchange for a monthly fee of $150, he receives each morning a copy of the fire department's "24 hour sheet," which lists every type of fire in the City of Detroit within a twenty-four-hour period. Herndon highlights all vehicle fires with the exception of those listed by the fire department as being due to carburetor or wiring short circuits.[1] Herndon, or an employee, would then proceed to the locations listed as having had vehicle fires and do a preliminary investigation. The preliminary investigation

---

[1] Apparently, Herndon investigated those fires as well at the beginning of his program, but quickly abandoned such investigations because the vehicles were rarely left at the scene of the fire since the owners were almost always with the vehicles at the time of the fire and had them promptly removed.

consisted of identifying the vehicle via the vehicle identification number or the license plate number, photographing the fire scene, physically examining the automobile, and canvassing the area for any potential witnesses. Herndon then makes a preliminary report of the investigation. It takes approximately 1 to 1½ hours for each investigation.

After returning to the office, Herndon ascertains the identity of the titleholder of the vehicle from the VIN or license plate number through the Secretary of State. Approximately once a week, Herndon's secretary compiles a list describing all vehicles the agency has investigated by the name and address of the titleholder, the year and make of the vehicle, and the VIN. The list is then sent to approximately twenty-five insurance companies enrolled in Herndon's program. The list does not include any other information derived from Herndon's preliminary investigation, nor does it contain any reference regarding whether arson is suspected as the cause of the fire.

Herndon does not have any formal contracts with any of the insurance companies which receive his weekly listings. Rather, there is an informal arrangement by which, after the insurance company receives the listings and determines whether it insures any of the vehicles listed, the insurance company contacts Herndon if it wishes to receive a formal investigation report. Herndon receives no compensation from the insurance companies for his weekly lists, but does receive compensation if the insurance company retains him in an individual case to conduct a further investigation and file a formal investigation report with the company with respect to any particular insured loss.

With respect to the September 1984 alleged theft and fire of plaintiffs' vehicle, Herndon had investigated the fire at the scene in response to the

vehicle being listed on the fire department's twenty-four-hour sheet and the vehicle was included in Herndon's listings sent to insurance companies for that week. The Auto Club of Michigan (AAA), which insured the vehicle, thereafter contacted Herndon and requested a formal investigation and report. Herndon conducted an additional investigation and filed a report with AAA which noted, among other things, that Herndon had located a witness who stated that he had seen the vehicle being driven by one Edward Fife in the area of the fire at approximately 8:00 or 9:00 P.M. on the evening of September 18, 1984. The witness further stated that this was not the first vehicle he had observed being operated by Fife and that the location where plaintiffs' vehicle had ultimately been recovered after the burning had been the scene of several automobile arson fires during the past year.

Herndon's report further noted that plaintiffs had reported their vehicle missing at 10:05 A.M. on the following morning, September 19, 1984, and that their report indicated that they discovered the vehicle missing at 8:00 A.M. that morning. Herndon's report also noted that plaintiffs' theft report indicates that the vehicle had been stolen sometime after 11:00 P.M. on the evening of the eighteenth. Thus, the witness' statement that he saw the vehicle in Fife's possession at 8:00 or 9:00 P.M. that evening was inconsistent with plaintiffs' claim that they had possession at least as late as 11:00 P.M. on the evening of the eighteenth.[2]

Herndon's report further noted that the radio was found to have been removed prior to the fire, but that the speakers were still intact in the

[2] The fire department arrived at the scene of the fire at 1:25 A.M. on the morning of the nineteenth, at which time the vehicle was totally engulfed in flames.

vehicle, as was the battery, the radiator, and the tires. He further noted that no personal effects were found either in the glove compartment or the rear portion of the vehicle. The report also noted the presence of an accelerant (gasoline). On the basis of these facts, Herndon's report offered the opinion that the vehicle was the subject of an arson and that the facts suggested that the theft report may not have been legitimate.

Sometime thereafter, AAA denied plaintiffs' claim for the loss, taking the position that the claim was fraudulently procured in that plaintiffs had arranged the theft and arson of the vehicle. It is not clear from the record what role defendant's report played in AAA's decision to deny the claim, though presumably AAA did rely on the report in reaching its determination that the claim should be denied. Thereafter, plaintiffs commenced a civil action against AAA alleging breach of the insurance contract. Ultimately, plaintiffs prevailed at trial and received a judgment against AAA under the insurance policy. Subsequently, plaintiffs commenced the instant action against defendants.

On appeal, plaintiffs allege that there exists a genuine issue of material fact regarding their claim of tortious interference with contract.[3] We disagree. This Court discussed the elements of tortious interference with contract in *Jim-Bob, Inc v Mehling,* 178 Mich App 71, 95-96; 443 NW2d 451 (1989):

> The elements of tortious interference with a contractual relationship are (1) a contract, (2) a breach, and (3) instigation of the breach without justification by the defendant. The arguments on appeal focus upon the third element. In *Formall,*

---

[3] Plaintiffs do not argue on appeal that the trial court erred in granting summary disposition on the emotional distress claim.

*Inc v Community Nat'l Bank of Pontiac* [166 Mich App 772, 779; 421 NW2d 289 (1988), quoting *Feldman v Green,* 138 Mich App 360, 378; 360 NW2d 881 (1984), lv den 422 Mich 961 (1985)] we stated the following with regard to the third element:

"[O]ne who alleges tortious interference with a contractual or business relationship must allege the intentional doing of a per se wrongful act or the doing of a lawful act with malice and unjustified in law for the purpose of invading the contractual rights or business relationship of another."

In interpreting the requirement that the defendant's wrongful conduct be for the purpose of invading the contractual rights or business relationship of another person, this Court has developed a rule that a defendant is not liable for tortious interference of contract where he is motivated by legitimate personal or business interests. In *Christner v Anderson, Nietzke & Co, PC,* 156 Mich App 330, 348-349; 401 NW2d 641 (1986), this Court held that a defendant's legitimate motivation per se shields it from liability in a tortious interference action. In *Jim-Bob, supra,* however, this Court declined to adopt such a rule, indicating instead that the defendant's motivation is but one of several factors to be weighed in assessing the propriety of the defendant's actions with other factors, including (1) the nature of the defendant's conduct, (2) the nature of plaintiff's contractual interest, (3) the social utility of the parties' respective interests, and (4) the proximity of the defendant's conduct to the interference. *Jim-Bob, supra* at 96-97.

In the case at bar, plaintiffs have made no showing of any facts to suggest an improper motivation by defendants in their conduct. The only wrongful act cited by plaintiff is an alleged trespass to chattel by Herndon in investigating the

fire. However, even assuming, without deciding, that Herndon committed a trespass to chattel by conducting a physical examination of the remains of plaintiffs' automobile, such intrusion is certainly slight in view of the fact that the car at that point was a burned-out hulk on a public street. More important, however, is the lack of any improper motive by Herndon in conducting the investigation. Simply put, plaintiffs make no showing of evidence to suggest that Herndon engaged in his conduct for the purpose of wrongfully interfering with plaintiffs' contract with AAA.

Rather, defendants were motivated by a legitimate business interest: to place themselves in a good position to be retained by the insurance company if it chooses to investigate the claim. That is, by conducting preliminary examinations of vehicle fires "on speculation," Herndon and his agency are in a prime position to be retained by the insurance companies they deal with to investigate the claims if the insurance companies choose to have any investigation at all, since Herndon will have taken the initiative to collect essential information which may be difficult or impossible to obtain by an investigation commenced several days after the fire.

There is no indication from the evidence procured that Herndon had any intention of causing the denial of claims by insurance companies, but only to be retained to conduct the investigations of those claims which the insurance companies chose to investigate. Moreover, there is certainly nothing wrong in insurance companies investigating claims or in retaining services of private investigation companies to conduct such investigations. Indeed, plaintiffs' argument arises not from the fact that AAA chose to investigate the claim or retained defendants to conduct the investigation, but from

defendants' taking the initiative to investigate the fire prior to being requested by AAA to do so.

However, what plaintiffs are unable to show is any evidence to support a conclusion that defendants engaged in their conduct with a wrongful or malicious intent to interfere with the contract. There is no evidence to suggest that defendants manufactured evidence to falsely create a potential arson defense for the insurance company, nor, for that matter, did defendants do anything to suggest to the insurance company that the fire may be attributable to arson or that the alleged theft had been arranged by plaintiffs prior to being retained by AAA to conduct a formal investigation. The only information transmitted by defendants to AAA in its initial weekly listing sheet was the fact that plaintiffs' vehicle had been involved in a fire. This information itself was not only accurate, but was derived from public information. Although Herndon's initial investigation undoubtedly led him to believe that arson was involved because his preliminary investigation detected the presence of an accelerant, that information was not transmitted to AAA.

Simply put, defendants' conduct, at most, informed AAA that a preliminary investigation had been performed and that defendants were available to conduct a formal investigation if AAA found the need to do so. Upon AAA's determination that a formal investigation of the claim was called for, it arranged with defendants to conduct a formal investigation and to file the report on the basis of the information derived during the preliminary investigation and any follow-up investigation performed by defendants.

In light of the evidence obtained, we conclude that the trial court correctly determined that there was no genuine issue of material fact regard-

ing the element of instigation of the breach without justification by defendants. Simply, there is no evidence that defendants acted with a wrongful purpose to instigate a breach of contract between plaintiffs and their insurance company. Had there been some showing that defendants manufactured evidence or maliciously and falsely represented to AAA that the fire was attributable to arson or that plaintiffs had arranged for the theft of the automobile, then perhaps it could be said that there was a tortious interference with contract. This, however, is not the case. Defendants merely were taking the initiative to gain an advantage over the competition, to be retained by insurance companies to conduct arson investigations in those cases the insurance companies felt the need to investigate. This is not a wrongful purpose. Accordingly, there can be no tortious interference with the insurance contract.

Indeed, Herndon's conduct indicates that he is a creative and innovative entrepreneur. Herndon recognized the need for a service to automobile insurance carriers, namely, a method of promptly apprising insurance companies of the fact that their insured automobiles had been the subject of arson and to arrange a prompt investigation of those potential arson cases, obtaining information which might be difficult or impossible to obtain if an investigation was not commenced until several days later after the insurance company learned of the arson through normal means. Herndon then filled this need by conducting such preliminary investigations on speculation, without being compensated directly for those investigations, but with the purpose of obtaining further business from the insurance companies in those cases in which the companies determined a need to investigate. Thus, the insurance companies receive a needed service,

Herndon obtains an edge on the competition and is able to obtain more fee-paying business as a result of the service provided, and the customers of the insurance companies are served because more accurate claims investigations will result in containment of costs by allowing the insurance companies to more accurately detect fraudulent claims, thus presumably resulting in lower insurance premiums. The only individuals who seem to be harmed by such conduct are those who are pursuing fraudulent claims. In sum, defendants' business activities should be applauded, not condemned.

Affirmed. Defendants may tax costs.