**LIBERTY HEATING & COOLING, INC., Plaintiff,**

v.

**BUILDERS SQUARE, INC., a Michigan corporation, Defendants.**

No. 90–CV–72819.

United States District Court, E.D. Michigan, S.D.

April 2, 1992.

Edward L. Ewald, Kitch, Saurbier, Drutchas, Wagner & Kenney, P.C., Detroit, Mich., for plaintiff Liberty Heating & Cooling, Inc.

Jon R. Steiger, Dickinson, Wright, Moon, VanDusen & Freeman, Bloomfield Hills, Mich., for defendant Builders Square, Inc.

## OPINION AND ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

EDMUNDS, District Judge.

This matter is before the Court on Defendant's motion for Summary Judgment. The parties to the action are Plaintiff Liberty Heating and Cooling, a Detroit based contractor of heating and cooling equip-

ment, and Defendant Builders Square, Inc., a national retailer of building supplies.

In 1989, Liberty approached Builders Square about initiating an arrangement whereby Liberty would sell heating and cooling equipment to Builders Square customers out of Builders Square stores. The proposed arrangement was for a "sell, furnish and install" relationship (SFI), by which Liberty would sell and install furnaces, air conditioners, and other heating and cooling equipment to customers through locations which it staffed in Builders Square stores; Liberty sold its own brand of equipment and provided its own installers.

From the outset, Liberty expressed an interest in expanding its SFI program beyond the Detroit area and also sought a written agreement with Builders Square. Builders Square, however, declined to make a commitment with respect to a specific term for the arrangement, and further declined to enter into a written contract. Mitch Rosen, president of Liberty and its principal witness, described the arrangement between Liberty and Builders Square as *"very, very vague."* Rosen at 167. He summarized it as follows:

Q. ... Let's say as of that time when it was confirmed and you knew you had it, what was it? When we talk about it, what's the deal from your perspective? What was the deal?

A. At that particular time it was that we would generate leads out of the store. We would run the leads. We would sell it on Builders Square paper, and we would invoice Builders Square for 85 percent of the job, and we would be paid.

Rosen at 173. Rosen testified that in his negotiations and conversations with Builders Square, *"[t]here was never any discussion of termination."* Rosen at 565. He also admits that there was never any agreement as to the duration of the Liberty/Builders Square relationship. Rosen at 173–74; 268–70. Specifically, Rosen testified:

Q. Was there any duration or term to this arrangement?

A. None. The only duration term that we had discussed—again this is strictly verbal discussions—is that we were looking at a five-year game plan.

Q. What do you mean by that?

A. We had outlined a game plan as to what we were gonna do over a five year period with Builders Square in general. My interest in Builders Square was not just Detroit from the outset, and I let everybody know that right from the beginning. I made no bones about it.

We had sat down and developed a game plan to how to—we were gonna try—Detroit was the first step. If were successful and Builders Square was happy with our sales, we would then move on to another area of the country.

Rosen at 173–74.

With respect to expansion beyond the Detroit area, Mitchell Rosen testified that as of March 1989, his understanding was "Hey you've got Detroit. Do a good job and the next place is Chicago." He stated that he had targeted the fall of 1989 to be in Chicago. Rosen at 166–67.

From the outset Liberty was interested in potential expansion to locations other than Detroit and Chicago. Rosen testified that Liberty would expand to other areas, "if Liberty was successful and Builders Square was happy with its sales." Rosen at 174, more fully quoted above. However, unlike Chicago where Jim Denny "gave the official go ahead," Builders Square never gave the "official go ahead" for any other market. The few vague discussions Rosen had concerning other location were with Bob Wokurka only, and not with Jim Denny. Rosen at 276 and 281. Rosen recognized that Builders Square could approve or not approve expansion into any other city on a case by case basis. Rosen at 479, 481.

Although Rosen testified that he was led to believe Kansas City, St. Louis, and Milwaukee would be the next cities to which Liberty might expand (assuming Builders Square was satisfied with Liberty's performance in Chicago), Liberty "never really

got too involved with those cities." Rosen at 285; Primich at 47. Liberty had no plan or forecast as to conducting business in markets other than Chicago.[1] Rosen at 482.

In September, 1989, Liberty had more concrete discussions with Builders Square about expanding into the Chicago market, including discussions with Jim Denny, Director of Installed Sales. Liberty was told that it could begin moving into Chicago, and shortly thereafter began setting up its Chicago program. To fulfill its Chicago area obligations, rather than establish its own presence in the Chicago Builders Square stores, Liberty established a dealer network, consisting of other heating and cooling contractors to which Liberty delegated the responsibility of staffing the Chicago stores. Through an intermediary, Liberty organized the independent contractors to service the Builders Square customers; Liberty itself never established a physical presence in Chicago.

In Detroit, Liberty received 85% of the money made on sales to Builders Square customers, while Builders Square retained 15%. In Chicago, Liberty's revenue derived solely from the initial $6,000 fees it charged the dealers it signed up, plus $1,250 per month rent that the dealers were required to pay Liberty. Rosen at 191–92; Brown at 85.

In the spring of 1990, a number of problems arose with the structure of the dealer network, including problems with improper dealer paperwork and delayed payments to dealers. As a result, Builders Square initiated some changes in the payment process which eliminated Liberty as a middleman. Rosen acknowledged at his deposition that there had not been any specific agreement between Builders Square and Liberty mandating any particular method of invoicing and payment. Rosen at 167, 173–174.

Rosen alleges that a lower level Builders Square Area Manager, Martin Mitchell (who reported to Bob Wokurka, a Regional Manager, who in turn reported to Jim Denny) was the alleged interferer who caused the paper work problems. Rosen stated that he believed that Mitchell took the actions he did because Mitchell felt that his way was better than Liberty's, and because he wanted to benefit Builders Square. Rosen at 409, 417, 445. Rosen complained to Jim Denny about what Rosen perceived to be interference by Mitchell, and Denny said he would straighten it out. Rosen at 408, 409. From subsequent events and conversations with Martin Mitchell, Rosen believes "that Jim talked to Martin and told Martin, 'Hey, play ball with these guys.'" Rosen at 448.

After five months of operations in Chicago, by July, 1990, Liberty had succeeded in placing contractors in only about one-half of the twenty Chicago area stores. Although Liberty was aware of Builders Square's dissatisfaction with the progress being made in Chicago and the overall structure of the operation, Liberty did not seem able to move forward with an effective SFI program for heating and cooling equipment in the Chicago stores. On July 6, 1990, Builders Square terminated its Chicago relationship with Liberty.

In June 1990, Builders Square hired a dealer whom Liberty had terminated from its Chicago network (for selling non-Liberty brand equipment), and placed the dealer in a different store which had not previously been staffed by a Liberty dealer. The arrangement between Builders Square and

---

1. With regard to expansion to Milwaukee, Rosen admitted that he had no discussions with the Builders Square installed sales manager for Milwaukee (Rosen at 383), and had no "dealers" lined up in Milwaukee. Rosen at 384; Primich at 47. In fact, while Liberty was in the Chicago market, Liberty learned that Builders Square already had a different heating and cooling contractor conducting a similar SFI program in Milwaukee. Rosen at 277 and 289.

With regard to expansion to St. Louis, Rosen admitted that the Liberty discussions with Builders Square concerning St. Louis were nonspecific; Rosen never even received the locations of specific stores. Rosen at 374. Although Rosen's father, who owns Flo–Co Supply Company, a heating and cooling equipment distributor, contacted a St. Louis contractor regarding Liberty's possible expansion to Builders Square St. Louis stores (see Affidavit of Stanley Rosen), neither Rosen nor his father had any contact with an specific dealer in St. Louis. Rosen at 375–76.

the dealer, Mel's Heating and Cooling, was a short-term day to day arrangement for selling heating and cooling equipment; Builders Square terminated Mel's when it terminated the arrangement with Liberty. Upon termination of the Chicago arrangement with Liberty, Builders Square ordered all dealers, including Mel's, to leave the stores and cease all operations with Builders Square. Mitchell at 234–35, 250–51; Misner at 83–84, 90; Ryan at 30; J. Gustafson at 29, 33. The Chicago area heating and cooling SFI program was completely discontinued as of August 1990. Mitchell at 234–35, 250–51; Misner at 83–84, 90. In the spring of 1991, some six months after termination, Builders Square started a new SFI program in Chicago. Fackler at 21; Ryan at 31–32; M. Gustafson at 37; J. Gustafson at 34; Mitchell at 251; Misner at 83–84, 90. Two or three of the former dealers located by Liberty are presently doing business with Builders Square. Love at 21; Heneka at 19–20.

Liberty claims that Builders Square breached certain promises and representations regarding expansion which it had made to Liberty and that it interfered with Liberty's contracts and business relationships with the dealers. As a result, Liberty sued Builders Square for fraud, promissory estoppel, tortious interference with business relations, tortious interference with contracts, tortious interference with prospective business advantage, and defamation. Liberty has admitted that the record is insufficient to support a claim for defamation or for a portion of its claim for tortious interference with business relationships or with contracts that involve its Chicago intermediary (Berkheimer). Those claims shall therefore be dismissed with prejudice.

## STANDARD FOR SUMMARY JUDGMENT

■ In considering a motion for summary judgment, the Court may grant the motion only if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c).[2] As the Supreme Court ruled in *Celotex*, "Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

■ The court must view the allegations of the complaint in the light most favorable to the non-moving party. *Windsor v. The Tennessean*, 719 F.2d 155, 158 (6th Cir. 1983). "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 265, 106 S.Ct. 2505, 2519, 91 L.Ed.2d 202 (1986).

■ However, the mere existence of a scintilla of evidence in support of the non-movant is not sufficient; there must be sufficient evidence upon which a jury could reasonably find for the non-movant. *Liberty Lobby*, 477 U.S. at 252, 106 S.Ct. at 2512. Also, where the non-moving party must meet a higher burden of proof than usual, that party must meet the same burden in resisting the motion for summary judgment. *Id.*

■ Summary judgment may even be granted where a defendant's state of mind is at issue. A plaintiff may not defeat a motion for summary judgment where defendant's state of mind is at issue merely bye asserting that a jury might disbelieve the defendant's denial of malice, for instance. "The movant has the burden of showing that there is no genuine issue of fact, but the plaintiff is not thereby relieved of his own burden of producing in turn evidence that would support a jury verdict." *Id.* at 256, 106 S.Ct. at 2514. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine

**2.** On a motion for summary judgment in a diversity case such as this, the provisions of Federal Rule of Civil Procedure 56 control its determination. *Reid v. Sears, Roebuck and Co.,* 790 F.2d 453, 459 (6th Cir.1986).

issue' for trial." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472 (6th Cir.1989) (citing *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)).

## FRAUD

### *Standards—Future Promises Made In Bad Faith*

■■■ In order to establish a prima facie case of fraud, a plaintiff must prove the following:

1. defendant made a material representation;
2. it was false;
3. defendant knew it was false, or made it recklessly, without any knowledge of its truth as a positive assertion;
4. it was made with the intent that it be relied upon by the plaintiff;
5. plaintiff in fact relied upon the statement; and
6. plaintiff was damaged.

*Candler v. Heigho*, 208 Mich. 115, 121, 175 N.W. 141 (1919); *In re Swantek Estate*, 172 Mich.App. 509, 515, 432 N.W.2d 307 (1988), *leave to appeal denied*, 432 Mich. 875 (1989). To prove fraud, a plaintiff must establish a misrepresentation of past or existing fact, or a future promise with bad faith intent not to fulfill the promise at the time it was made. *Hi–Way Motor Co. v. International Harvester Co.*, 398 Mich. 330, 336, 247 N.W.2d 813 (1976). Future promises are contractual and do not constitute fraud. *Id.*

In *Hi–Way*, the defendant had promised the plaintiff that he would give the plaintiff an exclusive trucking franchise "as long as he did a reasonable job." This was a future promise. *Id.* at 337, 247 N.W.2d 813. Thus, in order to prove fraud based on a future promise, the plaintiff attempted to demonstrate that the defendant made the future promise in bad faith. The plaintiff relied on a letter written by the defendant's attorney three years after the defendant's employees made the future promise. The letter denied that the defendant company had made a commitment to give plaintiff an exclusive franchise and stated that such a commitment would never have been honored due to company policy. The *Hi–Way* court noted that to prove fraudulent intent, "evidence ... must relate to conduct of the actor at the very time of making the representations, or almost immediately thereafter." 398 Mich. at 338–39, 247 N.W.2d 813 (citation omitted).

■■ The facts of *Hi–Way* are substantially similar to the facts in this case. Plaintiff alleges that Builders Square falsely represented that it wanted Liberty to expand to Builders Square Chicago area stores and throughout the country and that the Liberty/Builders Square arrangement would last for five years. However, the deposition testimony of Mitchell Rosen, the president of Liberty, contradicts this allegation. Rosen testified that Robert Wokurka (regional manager of Builders Square) represented that if Liberty was successful in Detroit, it would be permitted to expand to Chicago. Rosen at 166–67 and 174. Mr. Rosen also stated that the agreement was that if Liberty was successful and if Builders Square was happy with its sales, it would move on to other areas of the country. Rosen at 283. Liberty's own proposal letter stated that "If Liberty Heating and Builders Square determine that the S.F.I. heating and cooling program is successful, Liberty Heating reserves the right of first refusal to expand into any other mutually agreed upon Builders Square locations." Mr. Rosen also testified that there was no fixed term or duration to the arrangement [3]. Rosen at 173–74, 268–70, and 565.

---

3. Bruno Podlinsek, co-owner of Liberty, testified that he believed the Liberty/Builders Square program was for a term of five years, based on a conversation between Mr. Rosen and Mr. Denny that Mr. Podlinsek heard:

 Q. What do you recall hearing?

A. That we will be in this program for long-term program (sic). In excess of five years. That's what was brought up.
Q. Who brought that up?
A. Mr. Denny and Mitchell [Rosen].
(Podlinsek at 45). However, Mr. Podlinsek did not have any role in negotiating with Builders Square. (Podlinsek at 21, 32). Moreover, as

In the first instance, there can be no fraud based on Builders Square's representation that it would permit Liberty to expand into Chicago because Builders Square in fact did so. Thus, Builders Square's representations that it would permit Liberty to expand into the Chicago market were true. Builders Square did terminate the program six months later, however, after Builders Square became dissatisfied with Liberty's performance in Chicago; but because the Chicago arrangement was terminable at-will, the termination was not itself actionable as a breach of contract, nor was it contrary to any alleged representation of Builders Square's intent.

Through statements made by Bob Wokurka, Builders Square also represented that it would permit Liberty to expand to Builders Square stores throughout the United States if Liberty was successful and if Builders Square was happy with Liberty's sales. This representation, like the representation in *Hi–Way*, is not a statement regarding an existing fact. It is a future promise. For such a statement to be actionable on a claim for fraud, Liberty must show that Builders Square acted in bad faith.

 To prove bad faith, Liberty relies on a statement by James Denny, Wokurka's superior with final authority on all installed sales decisions, that he had no plan for Liberty to expand. Mr. Denny testified in his deposition as follows:

Q. In 1989, in the fall of 1989, was it your plan that Liberty Heating & Cooling would expand into other stores other than Chicago?

A. No, it was not.

Denny at 108. Even accepting as true the allegation that Mr. Wokurka made representations regarding Liberty's future expansion into other markets, and that Mr. Denny later stated that he had no plan in 1989 for Liberty's expansion beyond Chicago,[4] this is not evidence of bad faith. Plaintiff must show bad faith on the part of the person making the misrepresentation at the very time the representation was made or immediately thereafter, that is, one must look at the circumstances which existed contemporaneously with the promise. *Hi–Way*, 398 Mich. at 338–39, 247 N.W.2d 813. The statements of Mr. Denny do not provide evidence of bad faith. Builders Square had no firm plan for *any* particular dealer or contractor to be involved in national expansion in 1989. In fact, Denny told Rosen that the national SFI program would not get underway until February 1990, when the concept would be introduced to regional managers at the company's annual meeting.

### Standards—Apparent Authority and Reasonable Reliance

 Liberty also claims that Builders Square is bound by the apparent authority of its agent, Robert Wokurka, who made the representations to Liberty. A principal is vicariously liable for the torts of its agent when the agent acts within the scope of his usual employment or the principal has cloaked the agent with apparent authority. The persons dealing with an agent have the right to presume that the agent is authorized to do all things within the usual scope of the principal's business. *Central Wholesale Co. v. SEFA*, 351 Mich. 17, 27, 87 N.W.2d 94 (1957). However, a principal is not bound where his agent lacks authority and the person dealing with the agents knows or should know that the

---

noted in the text, Mr. Rosen's testimony establishes that Liberty and Builders Square never set a term or duration for their arrangement.

**4.** This statement from Mr. Denny's deposition also fails to demonstrate bad faith clearly and convincingly. Due to the contingent nature of the future promise made to Liberty, that Liberty would be permitted to expand if it was successful and if Builders Square was happy with its sales, of course Mr. Denny had no plan to permit Liberty's expansion prior to Liberty's meet-

ing such contingencies. Mr. Denny was asked about his state of mind in 1989, at a date when Liberty had not even begun establishing its Chicago network. Moreover, the statement is taken out of context. A complete reading of Mr. Denny's deposition reveals that while Mr. Denny hoped to expand the sales of heating and cooling equipment in Builders Square stores, in the fall of 1989 no final decision had been made even as to the Chicago expansion that did take place.

agent lacks authority. *Modern Globe Inc. v. 1425 Lake Drive Corp.*, 340 Mich. 663, 667, 66 N.W.2d 92 (1954). A person dealing with an agent should inquire into the agent's authority. *Cutler v. Grinnell Brothers*, 325 Mich. 370, 376, 38 N.W.2d 893 (1949).

▮ While Robert Wokurka may have had apparent authority to bind Builders Square and while he may have made representations, Liberty knew that he did not have ultimate authority with respect to significant issues involving the SFI program. His superior, James Denny had to approve everything concerning installed sales. Mr. Rosen knew that Mr. Wokurka did not have the authority to bind Builders Square. Rosen at 133, 140–41, 163, and 175–76. Thus, because Mr. Wokurka did not have the authority to bind Builders Square with respect to expansion of the SFI program, and because Mr. Rosen knew that Wokurka lacked authority, it was not reasonable for Liberty to rely on Wokurka's statements without approval from Denny.

*Burden of Proof—Summary Judgment*

▮ Fraud must be proved at trial by clear and convincing evidence. *Hi-Way*, 398 Mich. at 336, 247 N.W.2d 813. Thus, Liberty must meet this same standard in resisting Defendant's motion for summary judgment. *Liberty Lobby*, 477 U.S. at 252, 106 S.Ct. at 2512. Even drawing all justifiable inferences in favor of Liberty, Liberty has not presented clear and convincing evidence upon which a jury could find that Builders Square acted in bad faith, and thus that Builders Square is liable for fraud. Liberty also has failed to show clearly and convincingly that Builders Square should be bound by the representations by Wokurka when Liberty knew that Wokurka did not have the authority to bind Builders Square. Either of these grounds is sufficient to find that there is no genuine issue of material fact and Defendant is entitled to judgment on the claim of fraud as a matter of law. Defendant's motion for summary judgment on fraud (Count II of the Complaint) is hereby granted.

ESTOPPEL

▮ In order for a promise to be actionable under a claim of estoppel, there must be 1) a promise that the promisor should reasonably expect to induce definite and substantial reliance by the promisee; 2) detrimental and reasonable reliance by the promisee; 3) circumstances such that the promise must be enforced in order to avoid injustice. *Association of Hebrew Teachers v. Jewish Welfare Federation*, 62 Mich.App. 54, 60, 233 N.W.2d 184 (1975); *see also Stenke v. Quanex Corp.*, 759 F.Supp. 1244, 1246 (E.D.Mich.1991) (reliance must be reasonable). The promise itself must be definite and certain in order for it to be enforced. In *Association of Hebrew Teachers*, the defendant promised to negotiate and to possibly provide some financial support. The court found that this promise was too indefinite and uncertain to enforce. *Id.* 62 Mich.App. at 61, 233 N.W.2d 184.

▮ As noted in the section above regarding the issue of fraud, Builders Square promised to permit Liberty to expand to Chicago and all over the United States, if Liberty was successful and if Builders Square was happy with the sales. Rosen at 173–74. The Liberty/Builders Square arrangement was at-will, for there was no definite term or duration. Rosen at 173–73 and 268–270. Thus, while Liberty may have relied on Builders Square's alleged promise to permit expansion and to deal with Liberty for five years, such promises were too vague and indefinite to support a claim for estoppel. Further, because such promises were so vague, it was unreasonable for Liberty to rely on them. There is no genuine issue of material fact that supports Plaintiff's claim of estoppel. Defendant's motion for summary judgment is hereby granted on Count VII of the Complaint.

TORTIOUS INTERFERENCE WITH CONTRACT AND BUSINESS RELATIONS

Count IV alleges that Builders Square tortiously interfered with the business relationships between Liberty and its dealers,

and Count V alleges that Builders Square tortiously interfered with the contracts between Liberty and its dealers. Such interference consisted of Builders Square directing the dealers to make all payments directly to Builders Square and to deal in the future directly with Builders Square to the exclusion of Liberty. Also, Liberty alleges that Builders Square hired a terminated Liberty dealer on terms more favorable to the dealer than were offered by Liberty.

 The elements of a cause of action for tortious interference with a contract, business relationship, or expectancy are:

1. a contract, business relationship, or expectancy with a third party;

2. knowledge by the defendant of the contract, business relationship, or expectancy;

3. intentional and improper interference by the defendant that causes a breach, disruption, or termination of the contract, business relationship, or expectancy; and

4. damage to the plaintiff, whose contract, business relation, or expectancy has been breached, disrupted, or terminated.

*Monette d/b/a Gary's International Bread v. Am–7–7 Baking Co., Ltd d/b/a International Baking Co.*, 929 F.2d 276, 281 (6th Cir.1991); *Wood v. Herndon & Herndon*, 186 Mich.App. 495, 499–500, 465 N.W.2d 5 (1990). In a tortious interference action, a plaintiff must demonstrate that defendant acted intentionally and improperly. "Improper" has been defined as illegal, unethical, or fraudulent. *Weitting v. McFeeters*, 104 Mich.App. 188, 304 N.W.2d 525 (1981). A plaintiff must allege the intentional doing of a *per se wrongful act or the intentional doing of a lawful act with malice and unjustified in law* for the purpose of invading plaintiff's contractual rights or business relationship. *Feldman v. Green*, 138 Mich.App. 360, 369, 360 N.W.2d 881 (1984). In order to prove the doing of an act "with malice and unjustified in law," plaintiff must show specific, affirmative acts which corroborate the unlawful purpose of the interferer. *Id.* at

370, 360 N.W.2d 881. See e.g., *Monette*, 929 F.2d 276 (defendant tortiously interfered with plaintiff's business relations with retail customers because defendant acted with deceit in obtaining plaintiff's customer list).

### Improper Conduct or Motive

The critical issue in this case is whether Plaintiff has submitted sufficient evidence of some improper act or motive to withstand Defendant's motion for summary judgment. It is not enough for Plaintiff to allege that because the result of the Chicago experience was unhappy or unsatisfactory for Liberty that the Court must therefore infer some scheme or conspiracy on the part of Builders Square. Liberty has the burden of pointing to specific evidence which creates a material factual dispute concerning the propriety of Defendant's conduct and its impact on Plaintiff.

 Builders Square has alleged that it is not subject to a claim for tortious interference because its actions and motives ware all based on legitimate business interests. One panel of the Michigan Court of Appeals has held that a defendant is not liable for tortious interference where he is motivated by legitimate personal or business interest. *Christner v. Anderson, Nietzke & Co., PC*, 156 Mich.App. 330, 401 N.W.2d 641 (1986). In contrast, another panel of the Court of Appeals refused to adopt a per se rule and instead held that a defendant's motivation is but one of several factors a court should weigh in determining the propriety of defendant's actions. *Jim–Bob, Inc. v. Mehling*, 178 Mich.App. 71, 96–97, 443 N.W.2d 451 (1989). These factors include 1) the nature of the defendant's conduct; 2) the nature of the plaintiff's contractual rights; 3) the social utility of the plaintiff's and the defendant's respective interests; and 4) the proximity of the defendant's conduct to the interference. *Id.* at 97, 443 N.W.2d 451. While a defendant may have a legitimate business motivation for his actions, he may have an improper purpose as well. Thus, this Court will not apply a per se rule, but instead will look to all of the facts to deter-

mine whether there is a genuine issue of material fact regarding an improper act or motive of defendant.

Because improper conduct or motive is an essential element of a claim for tortious interference, cases where the plaintiff fails to present affirmative evidence of the same are appropriate for summary judgment. In *Wood v. Herndon & Herndon*, 186 Mich.App. 495, 465 N.W.2d 5 (1990), plaintiffs sued defendant for tortious interference with plaintiff's contract for car insurance. Defendant's company provided a service to insurance companies whereby it investigated car fires that were reported to the local fire department and sent a list of the cars that it had investigated to insurance companies. Then, any insurance company that was interested in obtaining a formal report would contact defendant. Plaintiffs reported that their car was stolen to their insurance company. Their car, in fact, had been involved in a fire and defendants had investigated the fire. The insurance company requested the report from defendant and later denied coverage on the basis of facts in the report that showed that plaintiffs had arranged the theft and arson of the car. *Id.* at 497–99, 465 N.W.2d 5.

The court found that plaintiffs had not shown that the defendant investigation company had done any wrongful act nor did it have an improper purpose. The defendant was motivated by a legitimate business interest to investigate car fires in hopes that it would be retained by insurance companies when they chose to investigate an insurance claim. The court also noted that the defendant provided a valuable service—it provided a needed service to insurance companies by enabling the companies to contain the cost of paying fraudulent claims, and thus keeping insurance rates down. 186 Mich.App. at 503–04, 465 N.W.2d 5. As a result, the court granted summary judgment in favor of the defendant. *See also Formall, Inc. v. Community National Bank of Pontiac*, 166 Mich.App. 772, 421 N.W.2d 289 (1988) (affirming summary judgment in favor of defendant because defendant's action in securing plaintiff's payment on a past due

loan was not improper; plaintiff failed to support its claim for tortious interference even though defendant's action prevented plaintiff from purchasing stock that it had contracted to buy).

One panel found that a claim of tortious interference was not appropriate for summary judgment where the plaintiff alleges an improper purpose and the defendant alleges a proper purpose, as in this case. In *Dolenga v. Aetna Casualty & Surety Co.*, 185 Mich.App. 620, 463 N.W.2d 179 (1990), the plaintiff provided rehabilitation services to workers compensation claimants. A claimant was referred to plaintiff by his physician. The claimant's insurance company requested the claimant to use a different rehabilitation service. As a result, plaintiff sued the insurance company for tortious interference. Defendant claimed that it suggested that the patient use another rehabilitation service because the other service was better suited to provide the services that the patient needed. *Id.* at 626, 463 N.W.2d 179. The plaintiff claimed that the insurance company in fact wanted the patient to use another service because the insurance company wanted to control the rehabilitation services provided and wanted to be able to terminate the services without regard to the patient's rights to receive such services. *Id.* at 627, 463 N.W.2d 179. The court found that the plaintiff had provided evidence of an improper motive:

> A review of the lower court record, including deposition evidence and affidavits, indicates that plaintiffs are in a position to present evidence that defendants choose a rehabilitation service provider on the basis of the provider's willingness to follow defendants' dictates, including the termination of services to a claimant at the request of defendants regardless of whether the claimant's need for those services has been satisfied. Plaintiffs also have evidence to suggest that their reputation in the industry is one of being a "client advocate" and pressing the needs of their clients when the carriers attempt to terminate

services prematurely, or at least prematurely in plaintiffs' judgment. 185 Mich.App. 620, 463 N.W.2d 179. Because the issue of the defendant's motive remained in dispute, summary judgment was not proper. *Id.* at 628, 463 N.W.2d 179.

*Dolenga* is distinguishable from this case. Here, Liberty has failed to show any evidence that Builders Square acted improperly or that it had an improper motive.[5]

*Builders Square's Conduct and Motive*

■ With regard to Builders Square's actions, Liberty claims that Builders Square interfered with its relationships with its dealers by reworking the invoicing procedure and eliminating Liberty as a middleman in this procedure. Originally, Liberty's dealers were paid for their equipment sales as follows: After a dealer sold and installed a heating and cooling unit, the invoice together with the payment would be sent to Builders Square. For stores in north Chicago, Martin Mitchell would receive these invoices. Mitchell was supposed to process these, and then send them to Builder Square in San Antonio. Liberty would then invoice Builders Square in San Antonio. Then, San Antonio would pay Liberty, who in turn would pay the dealers. Builders Square eventually circumvented this circuitous invoicing procedure by permitting the direct billing of Builders Square and by paying the dealers directly. Rosen at 440–41. Liberty alleges that the change in the invoicing and payment procedures constituted tortious interference with its business relationships and contracts with its dealers.

Liberty's claim of tortious interference on this ground is untenable. There was no specific agreement between Builders Square and Liberty mandating any particular method of payment. Rosen admitted that the terms of the arrangement were "very vague." Rosen at 167. Moreover, since Liberty was not being compensated on the basis of the volume of its dealers' sales, there was no reason for Liberty to have to be involved in the payment arrangements, i.e. Liberty did not have an interest in the accuracy of sales or commissions. Builders Square changed the procedure for legitimate business reasons, that is, because it had received dealer complaints regarding delays in payment. Brown at 82–83. The new process was faster and resulted in fewer mistakes. Liberty fails to present any affirmative evidence that the change in payment procedures was an improper act or that Builders Square had an improper motive for changing these procedures.

■ Liberty also claims that Builders Square interfered with its relationships and contracts with its dealers by arranging for the sale of heating and cooling equipment from a Builders Square store in Elgin by Mel's Heating and Cooling, a former Liberty dealer, for the last few weeks that Liberty operated in Builders Square stores in Chicago. Under Builders Square's arrangement with Mel's, Mel's did not have to pay the $1250 per month marketing fee that dealers were required to pay to Liberty. Also, while Liberty dealers were required to sell only Liberty label equip-

---

5. Builders Square also claims that plaintiff does not have a claim for tortious interference because the contract between Builders Square and Liberty was an at-will contract and tortious interference does not apply to an at-will contract. In fact, different panels of the Michigan Court of Appeals have rendered contradictory decisions on this issue. *Compare Feaheny v. Caldwell,* 175 Mich.App. 291, 437 N.W.2d 358 (1989) (while at-will contract cannot support claim for tortious interference with contract, it can support claim for tortious interference with expectancy) *with Environair, Inc. v. Steelcase, Inc.,* 190 Mich.App. 289, 475 N.W.2d 366 (1991) (termination of at-will contract cannot even give rise

to action for interference with business expectancy) *and Prysak v. Crestwood Dodge, Inc.,* 193 Mich.App. 1, 483 N.W.2d 629 (1992) (plaintiff may maintain action for tortious interference with at-will contract).

However, this Court does not need to determine which of these cases is applicable in this lawsuit. It is irrelevant that the contract between Builders Square and Liberty was at-will because the contracts/business relationships interfered with were the contracts and relationships between Liberty and its dealers. These contracts were not at-will; they were for a term of one year. Thus, Plaintiff's claim does not lack merit on these grounds.

ment[6] and to sell on a sell, furnish, and install basis only, Builders Square permitted Mel's to sell other label equipment and to sell equipment "out the door", i.e. for do-it-yourself installation. Liberty alleges that once other dealers saw what Mel's was doing, they wanted to deal directly with Builders Square too. Rosen at 435.

Secondly, Liberty's argument fails to demonstrate any improper action or motive on the part of Builders Square. Liberty itself terminated Mel's because Mel's was selling non-Liberty equipment. Gustafson at 24–25, Wokurka at 48. Builders Square permitted Mel's to operate out of the Builders Square Elgin store, a store where Liberty had not placed a dealer. Mitchell at 209, Wokurka at 56. This arrangement was on a day to day basis for about five weeks until Builders Square terminated it. About six months later Builders Square contracted with some heating and cooling dealers in Chicago. As part of this program, Builders Square contracted with Mel's again and with two other former Liberty dealers. No more than three of the former Liberty dealers are now doing business with Builders Square. Love at 21, Heneka at 19–20.

In fact, Builders Square's motives and incentives were coincident with those of Liberty, that is, both parties had every reason for wanting the Liberty program to be successful. Builders Square was motivated to retain the Liberty program because it did not want to deal with dozens of independent dealers (see Rosen at 151 and 415), and because it wanted to earn a percentage of the dealers' sales. Rosen at 191–92. Builders Square did not pay Liberty anything for Liberty's services. *Id.;* Brown at 85. Builders Square wanted to build and maintain goodwill with its customers, the same customers who were buying heating and cooling equipment from the Liberty dealers.

When Builders Square found the Liberty program in Chicago to be unsuccessful and terminated the arrangement, Builders

Square did not gain anything. In fact, due to the lack of success of the Liberty program, Builders Square lost customer goodwill. After the termination of Liberty, Builders Square was out of the heating and cooling equipment market for six months. Thus, Builders Square lost sales too. When Builders Square later started its own heating and cooling equipment program, it contracted with only two or three of the former Liberty dealers. There is no evidence that these contracts benefitted Builders Square more than when these dealers worked for Builders Square via Liberty.

*Causation and Damages*

Moreover, Liberty has failed to show that any of the alleged "improper" acts of Builders Square actually interfered with its relationships and contracts with the dealers. Liberty's argument fails because it is unsupported by any independent evidence from any dealer. Not a single dealer supported Rosen's contention that the relationship created by Builders Square with Mel's induced or encouraged them to seek their own independent relationship. No dealers withheld payment from Liberty. No dealers left the Liberty program because of Builders Square's actions. Thus, even if Liberty had evidence of an improper motive for hiring Mel's, the claim would fail because Liberty has no evidence of any damage which resulted from Builders Square's conduct in this matter.

The act of Builders Square that in fact interfered with Liberty's contracts and business relationships was the act of termination. Because the Builders Square/Liberty arrangement was at-will and, thus, Builders Square had the right to terminate the program, Liberty has not claimed and cannot claim that the termination by Builders Square was improper. Further, since Builders Square had the right to terminate the Liberty program, Builders Square cannot be held liable for actually terminating the program just because the inevitable result of the termination was that Liberty's

**6.** Note that Liberty did not earn any money from the sale of Liberty label equipment. Liberty's sole income in the Chicago program was income from the initiation fee and the monthly marketing fee charged to dealers.

contracts and relationships with its dealers were also ended.

Builders Square has shown that there is no genuine issue of material fact on the issue of tortious interference with contracts and business relations. Viewing the record as a whole, Liberty has not produced affirmative evidence of any improper conduct or motive on the part of Builders Square. Also, Liberty has not produced any evidence that any improper conduct of Builders Square actually interfered with Liberty's contracts and business relationships. Thus, Builders Square's motion for summary judgment on the claims of tortious interference with business relations (Count IV) and with contracts (Count V) is granted.

## TORTIOUS INTERFERENCE WITH PROSPECTIVE BUSINESS ADVANTAGE

 Liberty alleges in Count VI of the Complaint that Builders Square tortiously interfered with Liberty's business expectancy with contractors in Milwaukee, St. Louis, and Kansas City. To support a claim for tortious interference with an expectancy, however, Liberty must show that the business expectancy was a realistic expectation and not mere wishful thinking. *Trepel v. Pontiac Osteopathic Hospital*, 135 Mich.App. 361, 377, 354 N.W.2d 341 (1984). To demonstrate such a realistic expectation, Liberty must prove a business relationship with an identifiable class of third parties. *Schipani v. Ford Motor Co.*, 102 Mich.App. 606, 622, 302 N.W.2d 307 (1981). Liberty has produced no evidence of any such specific realistic expectancy. In his deposition Mr. Rosen was unable to identify any such expectancies. Rosen at 372–76, 383–84, and 481–82. Rosen testified that in fact Liberty had no plan or forecast as to conducting business in markets other than Chicago. Rosen at 482. Liberty "never really got too involved with those cities." Rosen at 285; Primich at 47. As a result, Plaintiff has failed to make a showing sufficient to establish a necessary element of its claim for tortious interference with a business expectancy. Thus, Defendant's motion for summary judgment on Count VI of the Complaint is granted; Plaintiff has failed to provide any evidence of a realistic expectation.

## CONCLUSION

Plaintiff has conceded that the record does not present evidence sufficient to support its claims for defamation (Count VII) and claims for tortious interference involving Berkheimer (part of Counts IV and V), and these claims are hereby voluntarily dismissed with prejudice. For the reasons stated in this opinion, Defendant's Motion for Summary Judgment is hereby GRANTED as to all of the remaining Counts of the Complaint, Counts II, III, IV, V, VI.