**TATA CONSULTANCY SERVICES, A DIVISION OF TATA SONS LTD., Plaintiff–Appellant,**

v.

**SYSTEMS INTERNATIONAL, INC., d/b/a Syntel, Inc., et al., Defendants–Appellees.**

**No. 92–1767.**

United States Court of Appeals, Sixth Circuit.

Argued April 30, 1993.

Decided Aug. 8, 1994.

Schwartz & Cohn, Detroit, MI, for defendants-appellees.

Before: GUY and NELSON, Circuit Judges; and SPIEGEL, District Judge.[*]

DAVID A. NELSON, Circuit Judge.

This case, in which the plaintiff asserts Michigan-law claims of tortious interference with contractual relationships, comes before us on appeal from a summary judgment for the defendants.

It is undisputed that personnel employed by the plaintiff for fixed terms were recruited to work for the defendant corporation before the expiration of their contracts with the plaintiff. The record leaves little room for doubt that a jury would be entitled to find that the defendants (with one exception) were not only familiar with the nature of the contracts, but affirmatively induced their breach. The key issue that we must decide is whether, if this case were to go to trial, a jury could also find that the instigators of the breaches of contract acted "improperly" and without justification.

Upon *de novo* review of the voluminous record compiled in the district court, we conclude that the defendants who did the recruiting of the plaintiff's employees were not entitled to summary judgment on the propriety of their conduct. The district court having held otherwise, we shall reverse the judgment and remand the case for further proceedings.

I

The plaintiff, the Tata Consulting Services Division of Tata Sons Ltd. of Bombay, India, provides computer consulting services to clients around the world. Defendant Systems International, Inc., doing business as Syntel, Inc., is a Michigan corporation that engages in the same type of business. The record indicates that plaintiff Tata employs over 1,800 professionals, while defendant

William M. Saxton, Keefe A. Brooks, Butzel, Long, Gust, Klein & Van Zile, Detroit, MI, Thomas Earl Patton (argued and briefed), Jack D. Franks, D.S. Sastri, Cherie B. Artz, Richard C. Walters, Schnader, Harrison, Segal & Lewis, Washington, DC, for plaintiff-appellant.

Norman C. Ankers (argued), Lee W. Brooks (briefed), Honigman, Miller,

* The Honorable S. Arthur Spiegel, United States District Judge for the Southern District of Ohio, sitting by designation.

Syntel has a workforce of about 300 professionals.

Tata claims not only that Syntel and its agents enticed Tata employees to violate their employment contracts by jumping ship in favor of Syntel, but also that Syntel used the pirated employees to take away business on which the employees had been engaged for Tata's clients. It is the first claim that has received the most attention from the litigants.

Evidence presented by way of deposition shows that Tata invests considerable time and effort in recruiting personnel from leading technical institutes in India. Representatives of the firm are said to have visited some 22 campuses in India during 1990, for example, interviewing an average of 60 candidates at each institution. Taking the evidence in the light most favorable to Tata, as we must at this stage of the proceedings, it appears that the firm is highly selective in its hiring.

Candidates are informed that newly-hired Tata employees have an initial service commitment of three years, a portion of which is devoted to training in India. (The head of Tata's technical training group gave a deposition in which he testified that new recruits receive approximately 24 to 26 weeks of classroom instruction, interspersed with several months of on-the-job training.) Employees with a sufficient level of expertise are often asked to accept "deputations" to work for Tata clients overseas under temporary visas. Each such employee normally agrees to return to India following the deputation and to remain in Tata's employ for twice the period of the deputation or a maximum of two years, whichever is less.

Defendant Bharat Desai, who is the president and one of two co-owners of defendant Syntel, went to work for Tata in 1975 following his graduation from the Indian Institute of Technology at Bombay. In 1976 he was deputed by Tata to work with Burroughs Corporation in the United States, at which time he signed an agreement committing himself to serve Tata for two years following his return to India. Mr. Desai left the firm's employ in 1978. He and the woman who is now his wife founded Syntel in 1980.

Mr. Desai's wife, defendant Neerja Desai (known professionally as Neerja Sethi), is likewise a former employee of Tata. Mrs. Desai is Syntel's vice-president in charge of internal services, and also serves as secretary-treasurer of the corporation.

The last of the three individual defendants, Mr. Prakash S. Kenjale, went to work for Tata as a trainee in June of 1974. He resigned in April of 1988 to join Syntel as a senior consultant. There is evidence that he has since been active in recruiting Tata employees for Syntel. Mr. Desai has also engaged in such activities, but we are unaware of any evidence that Mrs. Desai has done so.

In the course of this litigation Tata has taken the depositions of 16 former employees who, like others who were not deposed, left Tata to work for Syntel.[1] More than half of those deposed were persuaded to quit before completing their initial three-year employment obligations, and all of them left Tata's employ before completing the additional periods of employment to which they had committed themselves by accepting deputations overseas.

In November of 1987 Tata complained to Syntel about the latter's interference with Tata's contractual relationships with its employees. Tata's senior personnel manager in Bombay, Joseph Abraham, telephoned Mr. Desai at that time and threatened litigation if the raiding did not stop. Mr. Abraham has said in an affidavit that Mr. Desai was told he was interfering with Tata's contractual rights. The Abraham affidavit also indicates that Mr. Desai was specifically told of the existence of contracts obligating Tata employees to return to India following completion of their assignments in the United States. Mr. Desai allegedly agreed not to induce any more Tata employees to leave Tata for Syntel. (Mr. Desai has given a substantially different account of his ex-

---

1. As explained more fully hereafter, Syntel placed many of these people with Indian subcontractors rather than hiring them directly. All of the recruits from Tata were employed on projects for which Syntel was paid by the client, however. It was Syntel that supervised their work, and most of their compensation came directly from Syntel.

change with Mr. Abraham, but for present purposes we must accept the Abraham version.)

The truce held for several months, according to Mr. Abraham, but in June of 1988 Syntel again began approaching Tata employees to induce them to go to work for Syntel in violation of their contracts. The resumption of these activities seems to have coincided with the arrival of Mr. Kenjale at Syntel.

In November of 1989 Tata's regional personnel manager in New York, Mr. Ramaswamy Natarajan, telephoned Mr. Kenjale and pretended to be a Tata employee named "Rao" who wanted to explore the prospects for employment at Syntel. As "Mr. Rao," Natarajan subsequently testified, he told Kenjale that he had signed some contracts with Tata and did not want any legal problems. Kenjale's response, according to Natarajan, was as follows:

> "Don't worry about it. We have an excellent Personnel Department which can take care of that. I myself have come from [Tata]. I have worked in [Tata] for nearly fifteen to sixteen years and there are more than one hundred people from [Tata] that have abandoned their services and [Tata] has not taken any action and they cannot do anything."

Kenjale went on to say, according to Natarajan's deposition testimony, that although Tata would send some letters to his home, "Mr. Rao" should simply ignore the letters. Kenjale recommended that any advances received from Tata be repaid, but also recommended that "Mr. Rao" obtain a post office box in another city, give that address to Tata, and have a friend pick up the mail and forward it to him.

The deposition of Anuradha Krishnamurthy, a computer consultant with masters degrees in mathematics and computer science, provides something of a case study in how, as Tata sees it, the defendants wrongfully interfered with Tata's contractual relationships.

Ms. Krishnamurthy, a native of Madras in India, was hired by Tata as a trainee in February of 1986. She went through an initial training program of six to eight weeks' duration, and, perhaps because of her advanced education, was able to skip the second phase of Tata's formal training regimen.

Upon completion of her training, Ms. Krishnamurthy was assigned to work as a computer programmer for clients of Tata in Madras. Tata then sent her to New Zealand, where she helped develop a stock-registering system for the Reserve Bank of New Zealand. During the course of her assignment with the bank, which lasted about a year, she received on-the-job training in relational databases.

Returning to Madras, Ms. Krishnamurthy participated in the development of a computerized leasing system for another Tata account. That assignment lasted for nine months or so, after which, in July of 1988, Tata deputed her to work with one of its clients in the United States.

Under date of July 29, 1988, Ms. Krishnamurthy entered into a written deputation agreement in which she promised that upon completion of her assignment to the United States she would continue in Tata's employ for a term not less than twice the period of her employment in the United States, but not more than 24 months. Ms. Krishnamurthy testified that she knew it was important to Tata that she return to India after her deputation so that the valuable experience gained in the United States could be shared with others.

Ms. Krishnamurthy arrived in New York on July 31, 1988, traveling under a non-immigrant "B–1" visa for which she had been sponsored by Tata. In making the visa arrangements, it appears, Tata arranged to have her sign a certificate stating that she would not apply for a change in her visa status while on work assignment with the Tata client (incorrectly identified as "American Intercontinental") in the United States. Tata says that certificates such as this were furnished to the American consular service in India in order to obtain B–1 visas.

Ms. Krishnamurthy was assigned to do computer programming for American International Marketing Systems ("AIMS") in New York City. In her first project at AIMS, which lasted about two months, she utilized

the relational database knowledge she had acquired while employed by Tata in New Zealand. She subsequently went on to projects in which she created confidential "source codes," [2] working with AIMS personnel and a project leader employed by Tata.

In October of 1989 Ms. Krishnamurthy went back to Madras for a vacation. While there she married a fellow Tata employee named Prakash Mahadwan. Mr. Mahadwan was working at that time in Madras, to which he had returned a few months earlier from a deputation in New York.

Both Tata and AIMS understood that Ms. Krishnamurthy would resume her work with AIMS, under deputation from Tata, following her vacation in India. She testified that AIMS gave her a letter she needed in order to get back into the United States, and Tata bought and paid for her return plane ticket. By the time she used the ticket, however, she had decided not to continue the Tata deputation.

This decision followed a series of telephone conversations initiated by Syntel President Bharat Desai in October, just before Ms. Krishnamurthy started her vacation. Mr. Desai called her from Detroit, told her a little about Syntel, and was given a telephone number where Ms. Krishnamurthy could be reached in Madras. Mr. Desai called her at that number early in November and offered her a job. Notwithstanding her unexpired contractual obligation to Tata, Ms. Krishnamurthy subsequently agreed to go to work for Mr. Desai at a higher rate of pay than she had been receiving from Tata.

In the meantime Mr. Mahadwan, Ms. Krishnamurthy's husband-to-be, received a telephone call from Syntel's Mr. Kenjale. Mr. Kenjale introduced himself as a senior manager at Syntel and proceeded to tell Mr. Mahadwan about the company, its potential in the consulting business, and the opportunities for employment there. In the course of a telephone conversation a couple of weeks

later, Mr. Mahadwan "probably" advised Mr. Kenjale that he was still obligated to serve Tata for a period of time pursuant to his deputation agreement.[3] Mr. Kenjale nonetheless offered Mr. Mahadwan a job, and Mahadwan accepted the offer in December.

Mr. Kenjale told Mr. Mahadwan that Syntel paid "referral fees" for recruiting new people, and Mr. Mahadwan testified that his wife received a $500 referral fee for recruiting him. Mr. Desai confirmed in his deposition that it was Syntel's policy to pay bonuses to people who recruited new professionals. He said that Mr. Mahadwan was referred to Syntel by Ms. Krishnamurthy. While Mr. Desai did not know whether she actually received a bonus for this, he testified that she ought to have received one. The record indicates that Syntel paid referral fees to a number of present or former Tata employees, in addition to Ms. Krishnamurthy, for help in recruiting colleagues from Tata.

Ms. Krishnamurthy and Mr. Mahadwan accepted Syntel's offers of employment at about the same time, according to Ms. Krishnamurthy. She did not inform Tata of her plans before leaving India, although her husband submitted his resignation promptly. She was not sure, but Ms. Krishnamurthy said she believed that Mr. Desai was aware that she was not telling Tata about her acceptance of an offer from Syntel.

On December 29, 1989, shortly before she and her husband left India for New York, and after they had accepted the offers from Syntel, Ms. Krishnamurthy signed a new contract with Tata. This contract confirmed the existing employment relationship, spelled out the compensation that Tata was obliged to pay, confirmed that Ms. Krishnamurthy was still obligated to continue in Tata's employ for a term following completion of her assignment in the United States, and provided, among other things, that Tata could terminate the employment "for cause."[4] The

---

2. See *Comshare, Inc., v. United States,* 27 F.3d 1142 (6th Cir.1994), for an account of how source codes are used in the development of software products.

3. Mr. Kenjale testified that he was "generally" aware that Tata people assigned to the United

States had deputation agreements that required them to return to India and work for a certain term.

4. Cause was defined as "a material default or other breach by the Employee of the terms of this Agreement, including without limitation the Em-

contract contained a restrictive covenant under which Ms. Krishnamurthy agreed that during the period of her employment by Tata and for one year thereafter, she would do no work for a client company similar to the work she performed for that client while an employee of Tata.

Ms. Krishnamurthy flew to New York on December 31, 1989, using the airplane ticket provided her by Tata. A few days after her arrival she mailed Tata a letter of resignation. She reported for duty at AIMS during the third week in January, 1990, resuming essentially the same work she had been doing there before. Now, however, AIMS was billed for her time by Syntel, not Tata, and it was Syntel, not Tata, that profited from her work at AIMS. The arrangement constituted a clear breach of Ms. Krishnamurthy's contractual obligations to Tata.

Mr. Mahadwan was likewise assigned to work at AIMS. Unlike his wife, Mr. Mahadwan had not worked there during his prior deputation to New York. It is uncontested, however, that Mr. Mahadwan accepted the job offer from Mr. Kenjale at a time when he was still within Tata's "deputation period." Assuming the validity of the commitment to remain in the employ of Tata during that period, Mr. Mahadwan too was in breach of his contractual obligations.

For reasons not altogether clear, neither Ms. Krishnamurthy nor Mr. Mahadwan was ever placed on Syntel's payroll. Ms. Krishnamurthy testified that Mr. Desai told her that it would be easier for her to get a visa if she were employed by an Indian company rather than an American one. He therefore arranged for her to go on the payroll of Anand Consultancy Services, a Syntel contractor in Ahmedabad, India, effective December 31, 1989. She never visited Anand's offices while she was in Madras, never talked to anyone at Anand, and apparently had no communication of any kind with Anand except for the receipt of a small monthly salary paid her by Anand in Indian rupees. Syntel itself paid her a much larger "allowance," in

U.S. dollars, after she reached the United States.

Mr. Mahadwan went on the payroll of a Bombay company, also a Syntel contractor, called Leading Edge Systems. It was Leading Edge that arranged his transportation to the United States and served as his sponsor for visa purposes. Leading Edge paid Mahadwan a small monthly salary in rupees, and Syntel paid him a dollar allowance several times as large as his salary. Syntel did not deduct withholding taxes from the allowance payments.

Mr. Desai testified that subcontractors such as Anand and Leading Edge received subcontracting fees from Syntel in amounts exceeding the salary payments. He also said that the allowances paid by Syntel to people such as Ms. Krishnamurthy were paid "on behalf of" the subcontractors. Withholding taxes were the liability of the subcontractor, according to Mr. Desai, and Syntel would withhold taxes on the allowance payments if requested to do so by the subcontractor. (The record does not disclose, as far as we know, whether such a request was ever made.)

Mr. Desai testified that he was sure he had given Ms. Krishnamurthy a choice between being employed directly by Syntel and being employed by one of the subcontractors. It was his "guess," he said, that the majority of the 300 professionals in Syntel's workforce were direct employees of Syntel. One can only speculate as to why Ms. Krishnamurthy would have preferred to be on the payroll of a company she knew nothing about, assuming she already had a visa when she accepted Mr. Desai's offer.

From an operational standpoint, Syntel seems to have made no distinction between computer specialists whom it employed directly and those employed by its subcontractors. Syntel supervised the work of subcontractor employees in the same way that it supervised the work of its direct employees. In both cases the customer was billed according to the hours of work performed by the

---

ployee's unwillingness or inability to perform his duties hereunder for any reasons, or willful insubordination, dishonesty or disloyalty, or any

conduct by the Employee which, in the reasonable judgment of the officers of the Company, is materially detrimental to the Company."

professionals Syntel assigned to the customer.

Turning to another matter—one that may not have been a consideration as far as Ms. Krishnamurthy and Mr. Mahadwan were concerned—there is evidence that some Tata employees were "enticed" to work for Syntel, as the district court put it, by promises of help in obtaining H–1 visas, good for a substantially longer term in the United States than the temporary B–1 visas procured by Tata.[5] There is also evidence that Syntel offered to help Tata employees obtain the green cards necessary for permanent residence in this country. Acceptance of inducements such as these cannot be reconciled with the undertakings given by Tata employees when they left India for deputations to the United States.

## II

In April of 1990 Tata brought suit against Syntel, Mr. and Mrs. Desai, and Mr. Kenjale in the United States District Court for the Eastern District of Michigan. Jurisdiction was predicated on diversity of citizenship and an amount in controversy exceeding $50,000. The complaint set forth claims for relief based on (1) tortious interference with Tata's contractual relationships with its employees, (2) tortious interference with Tata's contractual relationships with its customers, and (3) misappropriation of confidential proprietary information.

The defendants filed an answer joining issue on each of these claims. Soon thereafter the defendants moved for summary judgment. The court denied the summary judgment motion in November of 1990.

Discovery proceedings, begun while the summary judgment motion was pending, continued over a period of some months. In April of 1991 the defendants filed a renewed motion for summary judgment. The plaintiff moved for partial summary judgment a few weeks later. The case was subsequently assigned to a new judge, who in April of 1992 filed a memorandum opinion and order denying the plaintiff's summary judgment motion and granting the defendants' renewed motion. Judgment was then entered dismissing with prejudice all of the claims in the complaint. Within the ten-day period specified in Rule 59(e), Fed.R.Civ.P., and Rule 4(a)(4)(F), Fed.R.App.P., the plaintiff filed a motion for reconsideration. In June of 1992 the court entered an order granting reconsideration but adhering, ultimately, to its earlier disposition of the case.

This appeal followed. Tata does not challenge the dismissal of its claim for misappropriation of proprietary information, so we are concerned here only with the propriety of the summary judgment entered in favor of the defendants on the claims for tortious interference with Tata's contractual relationships.

## III

The parties are in agreement that Tata's tortious interference claims are governed by the law of Michigan. They are also in agreement that the following summary of Michigan's law on tortious interference is, as far as it goes, accurate:

"'The elements of tortious interference with a contractual relationship are (1) a contract, (2) a breach, and (3) instigation of the breach without justification by the defendant.

\*    \*    \*    \*    \*    \*

"[O]ne who alleges tortious interference with a contractual or business relationship must allege the intentional doing of a per se wrongful act or the doing of a lawful act with malice and unjustified in law for the purpose of invading the contractual rights or business relationship of another."'" *Wood v. Herndon & Herndon Investigations, Inc.*, 186 Mich.App. 495, 499–500, 465 N.W.2d 5, 8 (1990) (quoting *Jim-Bob,*

---

**5.** A visitor for business traveling under a B–1 visa may be admitted to the United States for not more than one year and may be granted "extensions of temporary stay" in increments of up to six months. 8 C.F.R. § 214.2(b). An H–1B alien in a "specialty occupation" may spend up to six years in the United States. 8 C.F.R. § 214.2(h)(13)(iii)(A). Of the 16 Tata employees whose depositions were taken after they had been recruited by Syntel, no fewer than 11 ultimately obtained H–1 visas.

*Inc. v. Mehling,* 178 Mich.App. 71, 95–96, 443 N.W.2d 451 (1989)).

Focusing on the latter paragraph from the *Wood* opinion, and on cases such as *Weitting v. McFeeters,* 104 Mich.App. 188, 304 N.W.2d 525 (1981), where interference with an advantageous business relationship not evidenced by a formal contract was held to be permissible if the defendant did nothing "illegal, unethical, or fraudulent," 304 N.W.2d at 530, the defendants argue that they did not intentionally commit any act that was wrongful per se; that they acted lawfully and without malice; that they merely outbid Tata for the services of the people they hired, doing so to further their own economic interests; and that nothing they did was unethical, fraudulent, or otherwise unjustified or improper. The district court accepted these arguments, relying heavily on the decision of the Supreme Court of Michigan in *Meyering v. Russell,* 393 Mich. 770, 224 N.W.2d 280 (1974).

We shall turn to *Meyering* presently, but first it will be helpful to survey the Michigan law of tortious interference as it existed when *Meyering* was decided. An admirable guide to the caselaw may be found in *Feldman v. Green,* 138 Mich.App. 360, 360 N.W.2d 881 (1984), the opinion that is the source of the formulation adopted, with minor changes, in the second paragraph of the above-quoted passage from *Wood.*[6]

The Supreme Court of Michigan, as *Feldman* explains, first imposed liability for tortiously interfering with another's contract in *Morgan v. Andrews,* 107 Mich. 33, 64 N.W. 869 (1895). Although it did not cite the leading English case of *Lumley v. Gye,* 2 El. & Bl. (Q.B. 1853) 216, 118 Eng. Rep. 749, 22 L.J.Q.B. (N.S.) 463, the *Morgan* court endorsed the following passage from *Chipley v. Atkinson,* 23 Fla. 206, 1 So. 934 (1887), which was taken directly from *Lumley v. Gye:*

"Merely to persuade a person to break his contract may not be wrongful in law or fact; still, if the persuasion be used for the indirect purpose of injuring the plaintiff, *or benefiting the defendant at the expense of the plaintiff,* it is a malicious act, which, in law and in fact, is a wrongful act, and therefore an actionable act, if injury issues from it." *Morgan,* 107 Mich. at 39, 64 N.W. 869 (emphasis supplied).

The *Morgan* court likewise endorsed the principle applied in *Benton v. Pratt,* 2 Wend. (N.Y.) 385, a case where the statute of frauds had made the contract in question void, but recovery was nonetheless allowed "against a third person who maliciously interfered with the contract for his own gain or profit." *Morgan,* 107 Mich. at 39, 64 N.W. 869.

*Wilkinson v. Powe,* 300 Mich. 275, 1 N.W.2d 539 (1942), the next in this line of Michigan Supreme Court decisions, reinstated a jury verdict against dairy operators who had persuaded neighboring farmers to cancel milk-hauling contracts with the plaintiff so that the defendants could pick up the milk instead. Noting that the *Morgan* court had long since approved the rule of *Lumley v. Gye,* and quoting again the passage about the defendant's persuading a person to break a contract for the indirect purpose of "benefiting the defendant at the expense of the plaintiff," the court went on to declare that "[a] prima facie case is established when plaintiff proves the intentional procurement of a breach of contract, and, upon such proof, it becomes incumbent upon defendant to show justification." *Wilkinson,* 300 Mich. at 282, 1 N.W.2d 539.

"No categorical answer can be made to the question of what will constitute justification," the court said, "and it is usually held that this question is one for the jury." *Id.* at 283, 1 N.W.2d 539. Acknowledging that the defendants in the case before it would clearly have been within their legal rights if they had merely refused to accept further deliveries of milk by the plaintiff, the court pointed out that the defendants had done more: they had sent the farmers letters that "show[ed] active solicitation of a breach of the con-

---

**6.** "We hold, consistently with prior rulings by the Supreme Court of this state, that one who alleges tortious interference with a contractual or business relationship must allege the intentional doing of a per se wrongful act or the intentional doing of a lawful act with malice and unjustified in law for the purpose of invading plaintiff's contractual rights or business relationship." *Feldman,* 360 N.W.2d at 886.

tract[,] and their refusal to accept delivery of milk was merely another step in bringing about the breach." *Id.* at 284, 1 N.W.2d 539. It was the showing of "active solicitation" that completed the plaintiff's prima facie case [7] and made it incumbent on the defendants to persuade the jury that the solicitation had been justified.

The importance of "active solicitation" was reemphasized in *Bahr v. Miller Bros. Creamery,* 365 Mich. 415, 112 N.W.2d 463 (1961), where drivers who had contracted to make deliveries of milk for the plaintiff abandoned their contracts and started making deliveries for the defendant company instead. A judgment against the defendant company was reversed for the following reason:

"There is no testimony in this record from which it can be asserted or inferred that the corporate defendant approached, solicited or induced the breach of contract by the individual defendants. On the contrary, the approach appears to have been made wholly from the other direction...." 365 Mich. at 425, 112 N.W.2d 463.

The *Bahr* court reaffirmed the holding of *Wilkinson v. Powe* that "active solicitation" may render improper that which would otherwise be proper. In this connection the court quoted extensively from Mr. Justice Traynor's opinion in *Imperial Ice Co. v. Rossier,* 18 Cal.2d 33, 112 P.2d 631 (1941), a case in which it was held that an ice distributor's complaint against an ice manufacturer stated a cause of action for procuring the breach of a covenant not to compete because "[t]he plaintiff's complaint alleged that the defendant *intentionally and actively* induced the seller to violate his contract in order to sell

ice to it." *Bahr,* 365 Mich. at 424, 112 N.W.2d 463 (emphasis supplied). As quoted in *Bahr, id.* at 424–25, 112 N.W.2d 463, the California court commented as follows on the matter of active inducement:

"Had defendants merely sold ice to Coker without actively inducing him to violate his contract, his distribution of the ice in the forbidden territory in violation of his contract would not then have rendered defendants liable. They may carry on their business of selling ice as usual without incurring liability for breaches of contract by their customers. It is necessary to prove that they intentionally and actively induced the breach." *Imperial Ice,* 112 P.2d at 634.

As also noted in *Bahr, id.* 365 Mich. at 424, 112 N.W.2d 463, quoting *Imperial Ice,* 112 P.2d at 633, the California court issued the following caution:

"It is well established, however, that a person is not justified in inducing a breach of contract simply because he is in competition with one of the parties to the contract and seeks to further his own economic advantage at the expense of the other."

Further support for the view that a desire to further one's own economic interests does not constitute justification for actively inducing another to violate his contractual undertakings may be found in the commentary on § 768 of Restatement (Second) of Torts, as quoted in *Feldman v. Green,* 360 N.W.2d at 890 n. 2:

"(2) The fact that one is a competitor of another for the business of a third person does not prevent his causing a breach of an

---

7. The plaintiff had to show malice, of course, but legal malice can be inferred from the intentional doing of a wrongful act without justification:

"The great weight of authority in this country and in England is to the effect that, if A has a legal contract with B, either for the rendition of service or any other purpose, and C, having knowledge of the existence thereof, intentionally and knowingly, and without reasonable justification or excuse, induces B to break the contract, by reason of which A sustains damage, an action will lie by A against C to recover the same. * * * The action of C is malicious, in that, with the knowledge of A's rights, he intentionally and knowingly and for unworthy or selfish purposes, destroys them by inducing

B to break his contract. It is a wrongful act, done intentionally, without just cause, or excuse, and from this a malicious motive is to be inferred. This does not necessarily mean actual malice or ill will, but the intentional doing of a wrongful act without legal or social justification." *Wilkinson,* 300 Mich. at 282–83, 1 N.W.2d 539, quoting from *Campbell v. Gates,* 236 N.Y. 457, 141 N.E. 914 (1923), as quoted in *E.L. Husting Co. v. Coca Cola Co.,* 205 Wis. 356, 237 N.W. 85 (1931), *cert. denied,* 285 U.S. 538, 52 S.Ct. 311, 76 L.Ed. 931 (1932).

See also *Louis Schlesinger Co. v. Rice,* 4 N.J. 169, 72 A.2d 197, 203 (1950), as quoted in *Feldman,* 360 N.W.2d at 887: "Malice may be inferred from the absence of just cause or excuse."

existing contract with the other from being an improper interference if the contract is not terminable at will."

■ As applied to the case at bar, the significance of the body of law we have described is obvious. If an employee of Tata approached Syntel about a job, without having been solicited to do so by Syntel or anyone acting on its behalf, Syntel might well be justified in hiring the applicant whether or not his employment contract with Tata had expired. But if the approach came from Syntel—if Syntel sought out the Tata employee, in other words, and actively solicited him to come to work for Syntel knowing that the employee could not do so without breaking an existing contract with Tata—the hiring of the employee away from Tata might well be unjustified. Malice could be inferred from the wrongful act of inducing breach of the contract, and it would be no defense that Syntel acted not out of hatred or ill-will toward Tata, but solely in the interest of feathering its own economic nest at the expense of a competitor. Indeed, "the indirect purpose of ... benefiting the defendant at the expense of the plaintiff" would be critical to a finding of malice.

Against this backdrop, we now turn to the question of whether Michigan's law of tortious interference, as consistently applied from *Morgan* through *Bahr*,[8] was somehow turned on its head in 1974 by *Meyering v. Russell*, 393 Mich. 770, 224 N.W.2d 280 (1974). We conclude, as the reader will have inferred, that it was not.

*Meyering*, as explained in the intermediate court decision reported as *Meyering v. Russell*, 53 Mich.App. 695, 220 N.W.2d 121 (1974), involved two competing bidders for a parcel of mortgaged real estate that had previously been sold by defendant Russell on a land contract to a purchaser who fell substantially behind on his payments. Expecting to reacquire the property through foreclosure of the land contract, defendant Russell agreed on March 31, 1969, to convey the parcel to plaintiff Meyering on a new land contract. The closing was deferred to no

later than August 5, 1969, to give Mr. Russell time to foreclose the original land contract.

Shortly before the closing deadline, a real estate broker named Deitz contacted Russell with an offer to pay cash for the property and assume the balance of Russell's mortgage to the bank. Russell told Deitz about the March 31 agreement with Meyering, and Deitz testified that he did not contact Russell again until after the August 5 closing deadline had passed. Thereafter, no closing having occurred, Deitz signed an agreement to acquire the property for cash and assumption of the mortgage. Meyering subsequently sued Russell and recorded a *lis pendens,* a development of which Deitz was unaware when he accepted a warranty deed to the property a few days later. Deitz was then joined in the lawsuit. The trial court ultimately assessed compensatory damages against Deitz as "a conveyance intermeddler" and ordered specific performance of the purchase agreement between Meyering and Russell.

A panel of the Michigan Court of Appeals (1) upheld the order of specific performance, (2) upheld, with some modification, the award of damages against Deitz, and (3) held that Deitz could pursue a claim against Russell. One member of the panel, Judge O'Hara, agreed as to (1) and (3), but did not agree that there was any basis for finding that Deitz had tortiously interfered with the contractual rights of Meyering.

The Michigan Supreme Court granted leave to appeal and entered a one-sentence order summarily reversing the decision of the Court of Appeals "for the reasons set forth in the opinion in this case of Judge O'Hara of the Court of Appeals...." 224 N.W.2d at 281. It is to Judge O'Hara's partial dissent that we must look, therefore, to see whether the Supreme Court was effecting any significant change in Michigan's law of tortious interference.

Judge O'Hara's opinion was highly fact-specific. It did not cite a single precedent, much less suggest that any of Michigan's

**8.** See *Feldman v. Green,* 360 N.W.2d at 887 n. 1: "The essence of the tort has changed very little in form from that applied in England in the Nine-teenth Century and adopted in the United States in the latter part of the century."

prior tortious interference cases had been wrongly decided. Judge O'Hara's quarrel was clearly not with the established law, but with what he perceived to have been a misapplication of the law in a fluid situation where competitive bidding was entirely proper.

"Where 'dickering' as we know the term in our system is going on," Judge O'Hara wrote, "there is nothing legally impermissible in trying to better an offer that has had conditional acceptance only." 220 N.W.2d at 128. Judge O'Hara noted that "title to the parcel was, to say the least[,] somewhat murky," *id.*, and he obviously did not read the record as demonstrating the existence of a firm contract between Meyering and Russell, at least after the August 5 closing deadline had passed.[9]

As of August 5, Judge O'Hara observed in discussing a suggestion by the trial court that the parties should be put as nearly as possible in the positions they would have occupied had the conveyance to Meyering been made when required by the contract, "Russell would have had to specifically perform his 'contract' with Meyering." *Id.* at 129. Judge O'Hara noted elsewhere that "Meyering could have had the property at his agreed price and under his agreed terms by making the payment on time, into court if need be, and demanding performance by Russell." *Id.* at 130. But in outbidding Meyering after the closing deadline had passed, Deitz did nothing illegal or unethical; he simply called Russell two days after the expiration of the deadline—"as certainly was his right," in Judge O'Hara's words—"and asked him if the building was available." *Id.* at 129. Told that it was available, he worked out the details of the sale with Russell's attorney. "To me," said Judge O'Hara, "plaintiff's case completely fails of proof." *Id.*

We pause at this juncture to note that Judge O'Hara's opinion provides precious little support for the position of the defendants in the case at bar. Tata's offers of employment to people such as Ms. Krishnamurthy and Mr. Mahadwan had not received "conditional acceptance only." As the defendants must have known, Tata and its employees had passed the "dickering" or "backyard discussions" stage; they had entered into executed contracts fully capable of supporting actions for tortious interference. If Syntel wanted to bid against Tata for the services of these bright young men and women, it could have done so when they were on the job market; a jury could well find that Syntel was not justified in seeking them out after Tata had already found them, trained them, and committed itself to employing them for terms that had not yet expired.

Turning to the post-*Meyering* caselaw, we have already noted that *Feldman v. Green*, decided in 1984, contains an extensive discussion of the Michigan tortious interference cases spanning the better part of a century. Citing *Meyering*, the *Feldman* court concluded that the law in Michigan has not been "expanded" to impose liability on one who outbids and outmaneuvers a rival for the purchase of real estate. 360 N.W.2d at 890. *Feldman* contains no indication at all, however, that *Meyering* was intended to *narrow* the scope of liability for tortious interference. The *Feldman* panel specifically endorsed the proposition that "per se illegal acts by an interferor are not a prerequisite to liability." *Id.* at 886. Summary judgment for the defendant was affirmed because the plaintiff had not only failed to show any act by the defendant that was wrongful *per se*, he had failed to show "the doing of a lawful act with malice and unjustified in law for the purpose of invading the contractual rights or business relationship of another." *Id.* at 891.[10]

---

**9.** There may have been "backyard discussions" between Meyering and Russell, Judge O'Hara suggested, but the judge expressed dismay that "[a] free economic society can be so hampered by limitations upon the exercise of business judgment or acumen that backyard discussions can grow into executed contracts supporting actions for tortious interference." *Id.*

**10.** Elsewhere in its opinion the *Feldman* court quoted the trial judge who granted the defendant's summary judgment motion as having reasoned that "[s]ound public policy dictates that as long as a seller has not entered a binding contract or the prospective buyer has not utilized improper inducements, the seller should be encouraged to accept the offer most favorable to him." *Id.* 360 N.W.2d at 885.

In other post-*Meyering* real estate bidding cases, different panels of Michigan's Court of Appeals reached different results depending on the particular facts presented. See, for example, *Weitting v. McFeeters*, 104 Mich. App. 188, 304 N.W.2d 525 (1981) (holding that summary judgment should have been entered for the alleged interferer where the landowner had not entered into a binding contract to sell the land to the plaintiff); *Hutton v. Roberts*, 182 Mich.App. 153, 451 N.W.2d 536 (1989), *lv. to appeal den.*, 434 Mich. 919 (1990) (plaintiff not entitled to summary judgment against alleged interferer where trial record showed no active solicitation beyond presentation of a competing offer, and the legal status and probability of closing on the prior purchase agreement remained unclear); *Jim–Bob, Inc. v. Mehling*, 178 Mich.App. 71, 443 N.W.2d 451 (1989), *lv. to appeal den.*, 434 Mich. 865 (1990) (judgment on a verdict for the plaintiff affirmed where the interferer increased its competing offer, knowing of the plaintiff's contract, and agreed to indemnify the owner for any liability to the plaintiff). None of these cases suggests any material reduction in the level of protection afforded by Michigan law against active solicitation of a contacting party to repudiate its contractual obligations.

The case last cited, *Jim–Bob, Inc. v. Mehling*, disavowed any suggestion contained in *Christner v. Anderson, Nietzke & Co., P.C.*, 156 Mich.App. 330, 401 N.W.2d 641 (1986), *rev'd in part, on other grounds*, 433 Mich. 1, 444 N.W.2d 779 (1989), that one who interferes with another's contractual rights is necessarily "shielded from liability" if his acts "are in furtherance of legitimate personal or business interests." *Jim–Bob*, 443 N.W.2d at 462.[11] In the words of the *Jim–Bob* court,

"[T]he fact that certain actions are taken with the intent that they inure to the personal or pecuniary benefit of the defendant cannot, per se, in our view, weave a broad and impenetrable blanket of immunity from liability for those actions. Certainly,

in nearly all cases of interference, the defendant hopes to benefit by way of a resulting advancement of its personal or business interests. But these ends do not necessarily justify the means undertaken. A defendant may not, with impunity, sabotage the contractual agreements of others, and that defendant's cry that its actions were motivated by purely business interests cannot, standing alone, operate as a miracle cure making all that was wrong, right. On the contrary, the defendant's motive is but one of several factors which must be weighed in assessing the propriety of the defendant's actions. Such factors include (1) the nature of the defendant's conduct, (2) the nature of the plaintiff's contractual interest, (3) the social utility of the plaintiff's and the defendant's respective interests, and (4) the proximity of the defendant's conduct to the interference." *Id.* at 462–63 (citing Restatement (Second) of Torts, § 767 and comments thereto).

The approach taken by the Court of Appeals in *Jim–Bob* seems entirely consistent with that taken by the Supreme Court in *Wilkinson v. Powe*, 300 Mich. 275, 1 N.W.2d 539, *supra*. There, it will be recalled, the Supreme Court said that there can be no categorical answer to the question of what will constitute justification, "and it is usually held that this question is one for the jury." *Id.* at 283, 1 N.W.2d 539.

■ Up to this point, our analysis has been predicated on the assumption that Tata's contracts with its employees were binding for the time periods agreed to. The district court, however, concluded that the contracts "lack mutuality as to the term of employment and would not be enforceable for a term certain under Michigan law." The court therefore treated the contracts as establishing nothing more than a business expectancy or at-will relationship, deserving of less protection against tortious interference than enforceable bilateral contracts would receive. See *Kand Medical, Inc. v. Freund*

---

**11.** In the context of employment contracts, the principle attributed to *Christner* is inconsistent with the following passage from Restatement (Second) of Agency, § 312, comment a:

"In the absence of a privilege, one who intentionally causes a servant or other agent to break a contract of employment is liable to the employer. Privileges to do this are rare; *business competition does not give rise to one.*" (Emphasis supplied.)

*Medical Prods., Inc.*, 963 F.2d 125 (6th Cir. 1992), holding that less protection is accorded under Ohio law to an "exitable" contract— *i.e.*, a contract terminable at will—than to one that the contracting party is not entitled to terminate at will. "There is a significant distinction between intentionally inducing a breach of contract and intending to induce the lawful termination of a contract." *Id.* at 129.

On the record before us, we are not persuaded that Tata's employees were legally free to terminate their contracts whenever they pleased. The contracts were not lacking in mutuality, Tata not having reserved the right to discharge an employee during the term of his contract except for cause. (Under Michigan law, moreover, "[t]he enforceability of a contract depends ... on consideration and not mutuality of obligation." *Toussaint v. Blue Cross & Blue Shield of Mich.*, 408 Mich. 579, 600, 292 N.W.2d 880, 885 (1980).) Tata remained obligated to pay the agreed wages as long as the employee remained on the payroll.

■ The duration of the contracts, moreover, does not appear unreasonable. A three-year commitment is certainly not unusual, as anyone who has enlisted in the armed forces of the United States can attest, and a post-deputation commitment not exceeding two years in length does not, on its face, seem oppressive. We have seen nothing in the record to suggest that an employee who preferred not to accept a deputation overseas, with the attendant lengthening of his employment term, would not have been free to decline the deputation.

It is true that Tata could end a deputation without having to show good cause for doing so, but termination of a deputation did not mean termination of employment. Upon his return to India the employee would still be entitled to receive his salary, and he would still be obligated to work for Tata until the expiration of the agreed term.

■ It is also true that many of Tata's employment contracts contained liquidated damages provisions the enforceability of which might be questionable under American law. There is evidence that Tata has never

attempted to enforce these provisions, however, and the provisions were typically made severable by a standard-form severability clause. To invalidate the contracts in their entirety on the strength of the liquidated damages provisions would be to render the severability clauses meaningless.

There may be issues of fact as to whether Tata's employees were induced to sign contracts "blind," as it were. Tata seems to have been suspiciously inefficient, to say the least, in furnishing the employees copies of the signed documents. These are matters that the trier of fact can and should take into consideration, but they do not loom large enough at this point to compel the conclusion that the defendants are entitled to judgment as a matter of law.

■ Neither can we say, as a matter of law, that the nature of the defendants' conduct was so clearly beyond reproach from an ethical standpoint that a verdict in favor of the plaintiff would have to be set aside. Tata, as Syntel had every reason to be aware, had made a considerable investment in selecting and training its employees. It sought to protect that investment, as Syntel almost certainly knew, by entering into contracts that must be presumed, at this juncture, to have secured for Tata the exclusive right to the employees' services for three years or longer, depending on whether the employees accepted overseas deputations. Yet Syntel, if Tata's evidence is to be credited, sought to reap where it had not sown by actively and systematically soliciting Tata employees to come to work for Syntel before they were legally free to do so. Syntel even adopted a policy of paying bounties to people who helped in the recruiting effort. Syntel may have encouraged Tata employees to conceal their whereabouts from Tata after they had been enticed away. Syntel apparently offered to help Tata employees change their immigration status in ways that may or may not have been legal, but that clearly could not be reconciled with the written undertakings given by the employees when they left India. And Syntel interposed Indian subcontractors between itself and the employees for reasons that appear to merit closer scrutiny under the immigration and tax laws than

they have received thus far. (The district court did not address the latter point at all, and we raise the question without prejudging the answer.) All in all, it seems to us, there is enough doubt about the propriety of Syntel's conduct—and the conduct of Mr. Desai and Mr. Kenjale—to make summary judgment in favor of these defendants inappropriate as far as the claim of tortious interference with the employment contracts is concerned.

As to Tata's contracts with its clients, we assume for purposes of analysis that they were terminable by the clients at will. If Syntel wrongfully interfered with the contracts under which Tata employed the personnel it used in servicing the clients, however, and if Syntel thereby took away business that Tata would not have lost otherwise, we think that Tata could ultimately be allowed to recover for tortious interference with these advantageous business relationships. The law of Michigan clearly recognizes the tort of interference with advantageous relationships of the sort that Tata enjoyed with, for example, AIMS. See *Northern Plumbing & Heating, Inc. v. Henderson Bros., Inc.*, 83 Mich. App. 84, 268 N.W.2d 296 (1978); *Bonelli v. Volkswagen of America, Inc.*, 166 Mich.App. 483, 421 N.W.2d 213, *lv. to appeal den.*, 430 Mich. 896 (1988).

The judgment in favor of the defendants on Tata's third cause of action (misappropriation of proprietary information) is **AFFIRMED**. The judgment in favor of defendant Neerja Desai is **AFFIRMED** as to the first and second causes of action as well. The judgment in favor of the remaining defendants is **REVERSED** as to the first and second causes of action, and the case is **REMANDED** for further proceedings not inconsistent with this opinion.