*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
ELECTRONIC CITATION: 2002 FED App. 0302P (6th Cir.)
File Name: 02a0302p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

————————————

ADR NORTH AMERICA,
L.L.C.,
     *Plaintiff-Appellant,*

     *v.*

AGWAY, INC. d/b/a Agway
Retail Services,
     *Defendant-Appellee.*

No. 01-1552

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 99-76396—Victoria A. Roberts, District Judge.

Argued: August 1, 2002

Decided and Filed: September 6, 2002

Before: SILER, COLE, and CLAY, Circuit Judges.

————————————

## COUNSEL

**ARGUED:** Theodore W. Seitz, RAYMOND & PROKOP,
P.C., Southfield, Michigan, for Appellant. Thomas D.
Keleher, BOND, SCHOENECK & KING, Syracuse, New
York, for Appellee. **ON BRIEF:** Theordore W. Seitz,
Robert E. Forrest, RAYMOND & PROKOP, P.C., Southfield,

Michigan, for Appellant.   Thomas D. Keleher, BOND, SCHOENECK & KING, LLP, Syracuse, New York, for Appellee.

————————

**OPINION**

————————

R. GUY COLE, JR., Circuit Judge.   This is a diversity action between ADR North America, L.L.C. ("ADR"), a Michigan consulting company and Agway, Inc. ("Agway"), a New York agricultural cooperative.   Defendant Agway retained ADR to help it restore its retail arm to profitability. After receiving several months of service from ADR, Agway hired one of ADR's employees and terminated the contract. ADR sued in federal court alleging breach of contract and tortious interference with an employment relationship under Michigan law.   The district court granted summary judgment to Agway.   ADR now appeals.

Because ADR has failed to come forward with evidence to create a genuine issue of material fact as to whether Agway is entitled to judgment as a matter of law, we **AFFIRM** the district court's judgment.

## I.  BACKGROUND

### A.  The Parties

ADR is a Michigan-based management consulting agency that specializes in corporate purchasing practices.   Agway is a New York-based agricultural cooperative that saw its retail division, Agway Retail Services ("ARS"), decline in profitability during 1997 and 1998.   Among the problems with ARS was inefficiency in its purchasing department, which annually purchased between $140 and $160 million in products.

shows that Agway's purchasing costs actually *increased* during the contract period between the parties.    ADR's failure to unearth contradictory evidence of actual savings is a defect that cannot be corrected on appeal.    *See White v. Anchor Motor Freight, Inc.*, 899 F.2d 555, 559 (6th Cir. 1990) (noting that an appellate court "review[s] the case presented to the district court rather than a better case fashioned after the district court's order" (quotation marks and citation omitted)).    Without some evidence of actual savings, ADR's claimed damages are wholly speculative.  As such, recovery is barred. *Wolverine*, 135 N.W.2d at 576.

## III.  CONCLUSION

For the foregoing reasons, the district court's judgment is **AFFIRMED**.

## B.  The Proposal and Terms

In 1997, ADR's Chief Executive Officer, William Michels, contacted Agway with a proposal to provide consulting services to Agway.  Michels was invited to a subsequent meeting before Agway's senior management in 1998. Following the meeting, Donald F. Schalk, then-president of ARS, requested that ADR submit a written sales proposal to him.

On February 22, 1998, ADR sent Schalk a document entitled "Agway's Opportunity for Competitive Advantage through Enhanced Purchasing: Proposal and Plan" (the "Proposal"), which outlined the various objectives and mechanics of the proposed consulting engagement.  Attached to and referenced by the Proposal was another document, the "ADR Standard Terms and Conditions of Business" (the "Terms").  Key to the present lawsuit, the Terms included provisions that governed the formation and amendment of the contract and prohibited the solicitation of ADR personnel:

1. FORMATION OF CONTRACT

   a.  These Terms and Conditions of Business . . . shall form part of the contract between the Client . . . and ADR . . . for the provision by ADR of the services set out in the Assignment unless otherwise agreed in writing by ADR.
   b.  The Assignment means the latest in date of the written proposal or engagement letter issued by ADR (and the Client's acceptance thereof) and the document (if any) issued by the client to commission the services of ADR (and ADR's written acceptance thereof).
   c.  The Contract shall comprise the Assignment, these Terms and any amendments thereto.
   d.  All amendments to the Contract must be in writing and signed by or on behalf of the Client and ADR . . . .
      . . . .

f.  In the event of any conflict between these Terms and the Assignment or any other document which forms part of the Contract, these terms shall prevail except where they have been amended (by specific reference to the relevant clause and paragraph of these Terms) as provided for herein.

. . . .

5.  PERSONNEL

a.  During the term of the Contract and for a period of six months after it's [sic] termination neither ADR nor the Client will directly or indirectly solicit, seek or procure the services of any employee of the other party connected with the Contract (other than by general advertising) without the prior written consent, and upon such terms specified by the other party.

J.A. at 440.  No one at Agway or ARS signed the Proposal or Terms, and Schalk testified that he never read the Terms.

On February 26, 1998, Schalk and ARS executive Bruce Dailey met with ADR's Michels to discuss the Proposal and the transfer of ARS purchasing data to ADR.  Michels testified that Schalk told him that "they were going to go forward with the proposal."

## C.  Confidentiality Agreement

On March 3, 1998, Agway and ADR signed a "Confidentiality Agreement." The Confidentiality Agreement provided that "[t]he Agreement contains the entire agreement of the parties with respect to the subject matter of this Agreement and supercedes all prior understandings or agreements." ADR was required to sign this agreement with Agway before it could review ARS's purchasing and financial records.  After reviewing the records, ADR projected that it could save Agway $7 million.

employment contract, that they had designated a role Goodman would play at Agway, and that they hired him without advising ADR and without consulting their own legal department.  However, none of ADR's citations to the record impeach this basic chronology -- that it was Goodman who first sought employment with Agway.  There is no evidence that Agway communicated any employment possibilities to Goodman prior to Goodman's expressed interest in joining Agway.  Absent such evidence of instigation, Agway's internal communications, without more, simply do not raise a genuine issue of material fact.  Consequently, we find that the district court did not err. *See Tata*, 31 F.3d at 427.

## 3.  *Three Percent Performance Bonus*

ADR's final allegation is that Agway breached the contract by failing to pay the 3% performance bonus specified in paragraph 6 of the Supply Agreement.  ADR argues that it can calculate the resulting damage based only on projected savings because the records are unrecoverable due to the dissolution of ARS after Goodman joined Agway.  Agway responds that ADR has not demonstrated that it breached the agreement.  Specifically, it argues that ADR has presented insufficient evidence to establish that Agway achieved any actual savings for the twelve months of the contract. Agway insists that any inability of ADR to gather evidence of actual savings during discovery is nullified by the fact that ADR withdrew its motion to compel Agway to produce further evidence.

We agree with Agway.  ADR conceded that savings were to be calculated based on actual net savings achieved.  Even if we assumed that Agway breached the agreement, ADR has not produced any method by which the fact of damages could be calculated with reasonable certainty. "[U]ncertainty as to the *fact* of legal damages . . . is fatal to recovery." *Wolverine Upholstery Co. v. Ammerman*, 135 N.W.2d 572, 576 (Mich. Ct. App. 1965); *see also In re F. Yeager Bridge & Culvert Co.*, 389 N.W.2d 99, 106 (Mich. Ct. App. 1986).  Indeed, the only record evidence based on actual Agway purchasing data

*Id.* at 425.

ADR argues that it has raised a genuine issue of material fact respecting whether Agway knew of a contractual relationship between ADR and Goodman and instigated a breach by Goodman without justification. Agway responds that Goodman was an at will employee for ADR when it hired him and hence Agway cannot meet even the first prong of the *Tata* test. Even if ADR could get past this hurdle, Agway contends, ADR has presented insufficient evidence to show that Agway instigated the breach.

We need not decide whether Goodman's contract was renewed or whether he was working at will at the time he left ADR for Agway,[3] because in either case ADR has not produced sufficient evidence to show that Agway actively solicited Goodman to sever the relationship. *See id.* at 424-26. Schalk testified that in "late September [or] early October" Goodman aggressively pursued employment opportunities with Agway. According to Schalk, Goodman presented an organizational chart for Agway with a new vice president position and claimed "I'm your guy for that position." Only after discovering that Goodman was interested in working for Agway did Agway ask for a resume. An official offer of employment was not extended until October 27, 1998.

ADR attempts to weave together threads of circumstantial evidence to show that Agway solicited Goodman. It argues that the record demonstrates that Agway executives talked about a "mutual interest" in Goodman joining Agway, that they were pleased with his work, that they knew about the

---

[3]Michigan courts have suggested that tortious interference with an at will employment relationship is cognizable under Michigan law. *See Feaheny v. Caldwell*, 437 N.W.2d 358, 363-64 (Mich. Ct. App. 1989)); *see also Jericho Constr., Inc. v. Quadrant, Inc.*, No. 206026, 1999 Mich. App. LEXIS, at *7 (Mich. Ct. App. Mar. 26, 1999) (unpublished). *But see Carlson v. Westbrooke Servs. Corp.*, 815 F. Supp. 1019, 1024 n.2 (E.D. Mich. 1992) (rejecting the reasoning of *Feaheny*).

## D. Supply Agreement

Michels testified that he and Mark Goodman, an ADR consultant, began interviewing ARS employees and reviewing records on March 9, 1998. During this time, ADR drafted a "Supply Agreement"; the Supply Agreement contained:

(a) a term that specified the purpose of the agreement;

> 1. *Purpose of Agreement*
> ADR has been retained by ARS to provide purchasing consulting services from March 1, 1998 to March 31, 1999.
>
> ADR has produced a proposal detailing the scope, objectives and deliverables from the project. ADR will use its best endeavors to complete the assignment in the proposed timescale.

(b) a term that incorporated by reference the March 3, 1999 Confidentiality Agreement;

> 3. *Confidentiality*
> The parties hereto and respective employees and directors of each shall maintain the confidentiality of information provided to the other pursuant to the terms of the confidentiality agreement between ARS and ADR (attached), the terms and conditions of which are hereby incorporated by reference.

(c) a payment term;

> 6. *Fees and Expenses*
> . . . .
> Retainer: ARS will pay a monthly retainer to ADR of $16,600 for the period of March 1, 1998, through March 31, 1999. In addition, ARS will pay ADR a 3% performance bonus on all savings achieved during the 12 months of this contract. This performance bonus is payable in two payments as cost savings are agreed. Payment 1 is due

November 30, 1998, and Payment 2 is due May 30, 1999:  Payment 2 is based on savings realized to date, less the amount of Payment 1.

(d) and an integration (or merger) clause;

   8. *Miscellaneous Clauses*

   . . . .

   8.3  This agreement constitutes the entire agreement with respect to the subject matter hereof and shall not be amended orally, but only by an agreement in writing signed by both parties that states that it is an amendment to this agreement.

J.A. at 444, 446.  Although paragraph one provided that the contract was effective from March 1, 1998 to March 31, 1999, the document was signed and dated March 16, 1998.

### E.  Hiring of Mark Goodman by Agway

   Schalk testified that Goodman, one of ADR's consultants, "aggressively was pursuing employment opportunities with Agway" in late September or early October of 1998.  Schalk alleged that while presenting a new organizational chart, Goodman campaigned for himself to fill the new position of "vice president of strategy and development."  Schalk asked Goodman for a resume and references in October 1998 and sent Goodman a written offer of employment that same month.

### F.  Termination of Consulting Relationship

   After Agway hired Goodman, it appears that the relationship between the two companies quickly soured.  ADR wrote Agway on December 7, 1998 in an attempt to salvage the consulting project.  Despite this effort, Agway sent a letter dated December 11 informing ADR that "the relationship [between the companies] has deteriorated to the point that continuation of the contract is no longer a viable option."  Agway's letter concluded that "the contract dated March 16, 1998, is hereby terminated."  The letter assured

416, 422 (6th Cir. 1994) (quoting *Jim-Bob, Inc. v. Mehling*, 443 N.W.2d 451, 462 (Mich. Ct. App. 1989)).  In *Tata*, the Tata corporation solicited and hired computer programmers and technical workers from India to work in the United States and other countries.  *Tata*, 31 F.3d at 417-18.  The Tata employees were obliged to serve for three years, *id.* at 418, with some contractual modifications for employees traveling to the United States, *id.* at 419.  Another company, Syntel, initiated a series of contacts with Tata employees encouraging them to leave Tata for Syntel.  *Id.* at 418, 419, 420.  Tata claimed tortious interference with its employment contracts; Syntel responded that it had simply made an employment offer, pursuant to its own business interests, and that such a business-based decision could not be "without justification."  We rejected Syntel's defense, finding that "a desire to further one's own economic interests does not constitute justification for actively inducing another to violate his contractual undertakings."  *Id.* at 424; *see also id.* at 427 (coming to the same conclusion after further survey of Michigan law).  However, we did emphasize that to show instigation a plaintiff must typically produce some evidence of a defendant's "active solicitation" of a plaintiff's employee.  *See id.* at 424-26.  For example:

   If an employee of Tata approached Syntel about a job, without having been solicited to do so by Syntel or anyone acting on its behalf, Syntel might well be justified in hiring the applicant whether or not his employment contract with Tata had expired. But if the approach came from Syntel -- if Syntel sought out the Tata employee, in other words, and actively solicited him to come to work for Syntel knowing that the employee could not do so without breaking an existing contract with Tata -- the hiring of the employee away from Tata might well be unjustified. Malice could be inferred from the wrongful act of inducing breach of the contract, and it would be no defense that Syntel acted not out of hatred or ill-will toward Tata, but solely in the interest of feathering its own economic nest at the expense of a competitor.

facial incompleteness is the use of the term "proposal" in paragraph one of the Supply Agreement. We find, however, that the statement that "ADR has produced a proposal detailing the scope, objectives and deliverables from the project" does not "specifically reference the Proposal," as ADR claims. Instead, we conclude that the language refers to the Supply Agreement itself. If the parties had intended to specifically reference the Proposal, they could have used the same explicit language with which they incorporated the Confidentiality Agreement. The fact that they knew how to use such clear language of incorporation, but chose not to use it, is highly probative -- and in this case dispositive -- evidence that the parties did not intend to incorporate the Proposal. *See Zurich Ins. v. CCR & Co.*, 576 N.W.2d 392, 397 (Mich. Ct. App. 1997) (a defendant could not introduce parol evidence to clarify an alleged ambiguity where the "terminology (and the necessity for its use, if agreed) was known and available to the scriveners but was not utilized for the purpose advocated by defendant").[2] ADR has failed to produce sufficient evidence to suggest that the Supply Agreement was intended to be anything other than the final and complete agreement between the parties.

### 2. *Tortious Interference With an Employment Relationship*

ADR alleges that Agway tortiously interfered with its employment relationship with Goodman. Under Michigan law, as explained by this Court, the elements of a tortious interference claim are (1) a contract, (2) a breach, and (3) instigation of the breach without justification by the defendant. *Tata Consultancy Servs. v. Sys. Int'l, Inc.*, 31 F.3d

---

[2]When read in light of the Proposal and Terms, it is possible to conclude that the Supply Agreement refers to the Proposal. But to read the Supply Agreement in this fashion would require us to look beyond the four corners of the Supply Agreement, and bootstrap otherwise impermissible parol evidence into the contract. *See Zurich Ins.*, 576 N.W.2d at 396 & n.3 (noting that, absent evidence that the terms are a "code," a party cannot use extrinsic evidence to show that facially unambiguous terms of an agreement are in fact ambiguous).

ADR that Agway would pay the $16,600 monthly retainer through March 31, 1999 and pay the 3% performance bonus on savings it actually realized by May 30, 1999. Shortly thereafter, Agway refused to pay ADR the 3% performance bonus on the grounds that it never realized any net savings for the one-year term of the Supply Agreement.

### G.  Procedure

ADR filed suit in federal district court on September 10, 1999. The district court addressed three issues: (1) whether Agway breached the contract between ADR and Agway by hiring Goodman; (2) whether Agway tortiously interfered with the employment relationship between ADR and Goodman; and (3) whether Agway breached the contract by refusing to pay ADR the 3% performance bonus.

Both sides sought summary judgment. The district court heard oral argument on March 21, 2001, and on the same day issued an oral ruling that granted Agway summary judgment on all three issues.[1]

ADR now appeals.

## II.  DISCUSSION

### A.  Standard of Review

We review the district court's grant of summary judgment *de novo*. *See Smith v. Ameritech*, 129 F.3d 857, 863 (6th Cir. 1997). Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c). In

---

[1]Agway did not itself move for summary judgment on the bonus issue. Instead, it argued for summary judgment in its written opposition to ADR's motion for summary judgment. The court found that ADR had supplied insufficient evidence that Agway had achieved any savings. Relying on a Seventh Circuit case, *Goldstein v. Fid. & Guar. Ins. Underwriters, Inc.*, 86 F.3d 749 (7th Cir. 1996), the court dismissed the action without motion by the defendants. *See id.* at 750-51.

deciding a motion for summary judgment, the district court must view the evidence in the light most favorable to the non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The operative question is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *In re Dollar Corp.*, 25 F.3d 1320, 1323 (6th Cir. 1994) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)).

## B. Analysis

### 1. *Breach of Contract Due to Agway's Hiring of Goodman*

Only paragraph 5 of the Terms restrains Agway's ability to hire an ADR employee. Thus, unless ADR can show that the Terms constituted part of its agreement with Agway, ADR cannot show that Agway's employment of Goodman caused a breach. ADR posits two theories of how the Terms constitute part of the agreement. The first is that the Proposal and Terms formed the initial agreement on or around February or March 1998. Under this theory, the subsequent signed documents -- the Confidentiality Agreement and the Supply Agreement -- are signed "amendments" to the contract under paragraph 1(d) of the Terms. Alternatively, ADR argues that the Supply Agreement is ambiguous and can only be understood by reference to the Proposal and Terms.

ADR's claim must fail, whether we begin with ADR's theory that the Proposal and Terms were amended by the Supply Agreement, or begin with ADR's theory that the Supply Agreement is ambiguous and clarified by the Proposal and Terms. Under Michigan's parol evidence rule, prior agreements or negotiations cannot contradict the terms of a document intended to be the final and complete expression of the parties' agreement. *Am. Anodco, Inc. v. Reynolds Metals Co.*, 743 F.2d 417, 422 (6th Cir. 1984); *see Archambo v. Lawyers Title Ins. Corp.*, 646 N.W.2d 170, 176-77 (Mich. 2002) (a subsequent contract abrogates the terms of a prior contract when evidence demonstrates such an intent). We

look to objective evidence, such as expressed words and visible acts, to determine the intent of the parties. *See Rood v. Gen. Dynamics Corp.*, 507 N.W.2d 591, 598 (Mich. 1993).

A written integration clause is conclusive evidence that the parties intended the document to be the final and complete expression of their agreement. *See Archambo*, 646 N.W.2d at 177 n.16; *UAW-GM Human Res. Ctr. v. KSL Recreation Corp.*, 579 N.W.2d 411, 418 (Mich. Ct. App. 1998); *see also Cook v. Little Caesar Enters., Inc.*, 210 F.3d 653, 656 (6th Cir. 2000) (applying Michigan law to a franchise agreement). It is also conclusive evidence that the parties intended to supersede any prior contract on the same subject matter. *See Archambo*, 646 N.W.2d at 177 n.16. The only exception to this rule is "in cases of fraud . . . or where an agreement is obviously incomplete 'on its face' and, therefore, parol evidence is necessary for the 'filling of gaps.'" *UAW-GM*, 579 N.W.2d at 418 (citation omitted); *see also Archambo*, 646 N.W.2d at 177 n.15.

ADR does not allege fraud. Therefore, it may only admit the Proposal and Terms if the Supply Agreement is incomplete "on its face." *UAW-GM*, 579 N.W.2d at 418. An agreement is incomplete on its face where it fails to specify "obvious elements of the deal struck." *Id.* at 420 n.12. However, we may not read ambiguity into a contract where none exists. *Farm Bureau Mut. Ins. Co. of Mich. v. Nikkel*, 596 N.W.2d 915, 920 (Mich. 1999). Furthermore, the Michigan Court of Appeals has counseled that we should construe the incompleteness exception narrowly, as "[a] broad interpretation of this exception would largely vitiate the purpose of [an integration] clause." *UAW-GM*, 579 N.W.2d at 420 n.12.

ADR has produced no objective evidence that the Supply Agreement is "incomplete on its face" or omits "obvious elements of the deal struck." The Supply Agreement plainly contains essential terms of a consulting contract including provisions for confidentiality, limitations on liability, fee structure, and termination. ADR's only credible argument for